858 F.2d 160
 28 ERC 1177, 57 USLW 2170, 19 Envtl.
L. Rep. 20,085
 UNITED STATES of America; South Carolina Department of
Health and Environmental Control, Plaintiffs-Appellees,
v.
MONSANTO COMPANY; Allied Corporation; E.M. Industries,
Inc.; Defendants- Appellants,
American Insurance Association; Chemical Manufacturers
Association Amici Curiae.
and
SOUTH CAROLINA RECYCLING AND DISPOSAL, INC.; Columbia
Organic Chemical Company; Oscar Seidenberg;
Harvey Hutchinson; Eaton Corporation;
Rad Services, Inc.; Aquair
Corporation; Defendants,
v.
G.D. SEARLE & COMPANY; Will Ross, Inc., Third Party Defendants.
UNITED STATES of America; South Carolina Department of
Health and Environmental Control, Plaintiffs-Appellees,
v.
Oscar SEIDENBERG; Harvey Hutchinson; Defendants-Appellants,
American Insurance Association; Chemical Manufacturers
Association, Amici Curiae.
and
MONSANTO COMPANY; Allied Corporation; Aquair Corporation;
E.M. Industries, Inc.; South Carolina Recycling and
Disposal, Inc.; Columbia Organic Chemical Company; Eaton
Corporation; Rad Services, Inc., Defendants,
v.
G.D. SEARLE & COMPANY; Will Ross, Inc., Third Party Defendants.
UNITED STATES of America Plaintiff-Appellant,
and
South Carolina Department of Health and Environmental
Control, Plaintiff,
v.
MONSANTO COMPANY; Allied Corporation; E.M. Industries
Inc.; South Carolina Recycling and Disposal,
Inc.; Oscar Seidenberg; Harvey
Hutchinson; Defendants-Appellees,
American Insurance Association; Chemical Manufacturers
Association, Amici Curiae.
and
COLUMBIA ORGANIC CHEMICAL COMPANY; Eaton Corporation; Rad
Services, Inc.; Aquair Corporation, Defendants,
v.
G.D. SEARLE & COMPANY; Will Ross, Inc., Third Party Defendants.
 Nos. 86-1261, 86-1263 and 86-1265.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 8, 1987.
Decided Sept. 7, 1988.
 
 George Clemon Freeman, Jr. (William F. Kennedy, Alfred R. Light, Thomas E. Knauer, Hunton & Williams, Richmond, Va., on brief), Isadore S. Bernstein (Hammer & Bernstein, Columbia, S.C. on brief), for defendants-appellants.
 David Carlisle Shilton, Dept. of Justice (F. Henry Habicht, II, Asst. Atty. Gen., Myles E. Flint, Deputy Asst. Atty. Gen., Washington, D.C., Vinton D. Lide, U.S. Atty., Mary G. Slocum, Asst. U.S. Atty., Columbia, S.C., Jacques B. Gelin, Dept. of Justice, Washington, D.C., Walton J. McLeod, III, Gen. Counsel, Walterboro, S.C., William T. Lavender, Jr., Dennis N. Cannon, Jr., Staff Counsel, South Carolina Dept. of Health & Environmental Control, Columbia, S.C., Charles De Saillan, Dov Weitman, E.P.A., Washington, D.C., on brief), for plaintiffs-appellees.
 (Edward W. Warren, David G. Norrell, Amy R. Sabrin, Kirkland & Ellis, David F. Zoll, Washington, D.C., Barbara A. Hindin, Los Angeles, Cal., on brief), for amicus curiae Chemical Mfrs. Ass'n.
 (Thomas W. Brunner, Laura A. Foggan, Piper & Marbury, Washington, D.C., on brief) for amicus curiae American Ins. Ass'n.
 Before WIDENER, SPROUSE and ERVIN, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 Oscar Seidenberg and Harvey Hutchinson (the site-owners) and Allied Corporation, Monsanto Company, and EM Industries, Inc. (the generator defendants),[1] appeal from the district court's entry of summary judgment holding them liable to the United States and the State of South Carolina (the governments) under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). 42 U.S.C.A. Sec. 9607(a) (West Supp.1987). The court determined that the defendants were liable jointly and severally for $1,813,624 in response costs accrued from the partial removal of hazardous waste from a disposal facility located near Columbia, South Carolina. The court declined, however, to assess prejudgment interest against the defendants. We affirm the district court's liability holdings, but we vacate and remand for reconsideration its denial of prejudgment interest.
 
 I.
 
 2
 In 1972, Seidenberg and Hutchinson leased a four-acre tract of land they owned to the Columbia Organic Chemical Company (COCC), a South Carolina chemical manufacturing corporation. The property, located along Bluff Road near Columbia, South Carolina, consisted of a small warehouse and surrounding areas. The lease was verbal, on a month-to-month basis, and according to the site-owners' deposition testimony, was executed for the sole purpose of allowing COCC to store raw materials and finished products in the warehouse. Seidenberg and Hutchinson received monthly lease payments of $200, which increased to $350 by 1980.
 
 
 3
 In the mid-1970s, COCC expanded its business to include the brokering and recycling of chemical waste generated by third parties. It used the Bluff Road site as a waste storage and disposal facility for its new operations. In 1976, COCC's principals incorporated South Carolina Recycling and Disposal Inc. (SCRDI), for the purpose of assuming COCC's waste-handling business, and the site-owners began accepting lease payments from SCRDI.
 
 
 4
 SCRDI contracted with numerous off-site waste producers for the transport, recycling, and disposal of chemical and other waste. Among these producers were agencies of the federal government and South Carolina,[2] and various private entities including the three generator defendants in this litigation. Although SCRDI operated other disposal sites, it deposited much of the waste it received at the Bluff Road facility. The waste stored at Bluff Road contained many chemical substances that federal law defines as "hazardous."
 
 
 5
 Between 1976 and 1980, SCRDI haphazardly deposited more than 7,000 fifty-five gallon drums of chemical waste on the four-acre Bluff Road site. It placed waste laden drums and containers wherever there was space, often without pallets to protect them from the damp ground. It stacked drums on top of one another without regard to the chemical compatibility of their contents. It maintained no documented safety procedures and kept no inventory of the stored chemicals. Over time many of the drums rusted, rotted, and otherwise deteriorated. Hazardous substances leaked from the decaying drums and oozed into the ground. The substances commingled with incompatible chemicals that had escaped from other containers, generating noxious fumes, fires, and explosions.
 
 
 6
 On October 26, 1977, a toxic cloud formed when chemicals leaking from rusted drums reacted with rainwater. Twelve responding firemen were hospitalized.[3] Again, on July 24, 1979, an explosion and fire resulted when chemicals stored in glass jars leaked onto drums containing incompatible substances. SCRDI'S site manager could not identify the substances that caused the explosion, making the fire difficult to extinguish.
 
 
 7
 In 1980, the Environmental Protection Agency (EPA) inspected the Bluff Road site. Its investigation revealed that the facility was filled well beyond its capacity with chemical waste. The number of drums and the reckless manner in which they were stacked precluded access to various areas in the site. Many of the drums observed were unlabeled, or their labels had become unreadable from exposure, rendering it impossible to identify their contents. The EPA concluded that the site posed "a major fire hazard."
 
 
 8
 Later that year, the United States filed suit under section 7003 of the Resource Conservation and Recovery Act, 42 U.S.C. Sec. 6973, against SCRDI, COCC, and Oscar Seidenberg. The complaint was filed before the December 11, 1980, effective date of CERCLA, and it sought only injunctive relief. Thereafter, the State of South Carolina intervened as a plaintiff in the pending action.
 
 
 9
 In the course of discovery, the governments identified a number of waste generators, including the generator defendants in this appeal, that had contracted with SCRDI for waste disposal. The governments notified the generators that they were potentially responsible for the costs of cleanup at Bluff Road under section 107(a) of the newly-enacted CERCLA. As a result of these contacts, the governments executed individual settlement agreements with twelve of the identified off-site producers. The generator defendants, however, declined to settle.
 
 
 10
 Using funds received from the settlements, the governments contracted with Triangle Resource Industries (TRI) to conduct a partial surface cleanup at the site. The contract required RAD Services, Inc., a subsidiary of TRI, to remove 75% of the drums found there and to keep a log of the removed drums. RAD completed its partial cleanup operation in October 1982. The log it prepared documented that it had removed containers and drums bearing the labels or markings of each of the three generator defendants.
 
 
 11
 The EPA reinspected the site after the first phase of the cleanup had been completed. The inspection revealed that closed drums and containers labeled with the insignia of each of the three generator defendants remained at the site. The EPA also collected samples of surface water, soil, and sediment from the site. Laboratory tests of the samples disclosed that several hazardous substances[4] contained in the waste the generator defendants had shipped to the site remained present at the site.[5]
 
 
 12
 Thereafter, South Carolina completed the remaining 25% of the surface cleanup. It used federal funds from the Hazardous Substances Response Trust Fund (Superfund), 42 U.S.C. Sec. 9631, as well as state money from the South Carolina Hazardous Waste Contingency Fund, S.C.Code Ann. Sec. 44-56-160, and in-kind contribution of other state funds to match the federal contribution.
 
 
 13
 In 1982, the governments filed an amended complaint, adding the three generator defendants and site-owner Harvey Hutchinson, and including claims under section 107(a) of CERCLA against all of the nonsettling defendants. The governments alleged that the generator defendants and site-owners were jointly and severally liable under section 107(a) for the costs expended completing the surface cleanup at Bluff Road.
 
 
 14
 In response, the site-owners contended that they were innocent absentee landlords unaware of and unconnected to the waste disposal activities that took place on their land. They maintained that their lease with COCC did not allow COCC (or SCRDI) to store chemical waste on the premises, but they admitted that they became aware of waste storage in 1977 and accepted lease payments until 1980.
 
 
 15
 The generator defendants likewise denied liability for the governments' response costs.[6] Among other defenses, they claimed that none of their specific waste materials contributed to the hazardous conditions at Bluff Road, and that retroactive imposition of CERCLA liability on them was unconstitutional. They also asserted that they could establish an affirmative defense to CERCLA liability under section 107(b)(3), 42 U.S.C. Sec. 9607(b)(3), by showing that the harm at the site was caused solely through the conduct of unrelated third parties. All parties thereafter moved for summary judgment.
 
 
 16
 After an evidentiary hearing, the district court granted the governments' summary judgment motion on CERCLA liability. The court found that all of the defendants were responsible parties under section 107(a), and that none of them had presented sufficient evidence to support an affirmative defense under section 107(b).[7] The court further concluded that the environmental harm at Bluff Road was "indivisible," and it held all of the defendants jointly and severally liable for the governments' response costs. United States v. South Carolina Recycling & Disposal, Inc., 653 F.Supp. 984 (D.S.C.1984) (SCRDI ).
 
 
 17
 As to the site-owners' liability, the court found it sufficient that they owned the Bluff Road site at the time hazardous substances were deposited there. Id. at 993 (interpreting 42 U.S.C.A. Sec. 9607(a)(2) (West Supp.1987)). It rejected their contentions that Congress did not intend to subject "innocent" landowners to CERCLA liability. The court similarly found summary judgment appropriate against the generator defendants because it was undisputed that (1) they shipped hazardous substances to the Bluff Road facility; (2) hazardous substances "like" those present in the generator defendants' waste were found at the facility; and (3) there had been a release of hazardous substances at the site. SCRDI, 653 F.Supp. at 991-93 (interpreting 42 U.S.C.A. Sec. 9607(a)(3) (West Supp.1987)). In this context, the court rejected the generator defendants' arguments that the governments had to prove that their specific waste contributed to the harm at the site, and it found their constitutional contentions to be "without force." SCRDI, 653 F.Supp. at 992-93, 995-98. Finally, since none of the defendants challenged the governments' itemized accounting of response costs, the court ordered them to pay the full $1,813,624 that had been requested. Id. at 1009, 1014. It refused, however, to add prejudgment interest to the amount owed. Id. at 1009. This appeal followed.
 
 II.
 
 18
 The site-owners and the generator defendants first contest the imposition of CERCLA liability vel non, and they challenge the propriety of summary judgment in light of the evidence presented to the trial court. The site-owners also reassert the "innocent landowner" defense that the district court rejected, and claim that the court erroneously precluded them from presenting evidence of a valid affirmative defense under section 107(b)(3), 42 U.S.C. Sec. 9607(b)(3). The generator defendants likewise repeat their arguments based on the governments' failure to establish a nexus between their specific waste and the harm at the site. They also claim that the trial court ignored material factual issues relevant to affirmative defenses to liability. We address these contentions sequentially, but pause briefly to review the structure of CERCLA's liability scheme.
 
 
 19
 In CERCLA, Congress established "an array of mechanisms to combat the increasingly serious problem of hazardous substance releases." Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1078 (1st Cir.1986).[8] Section 107(a) of the statute sets forth the principal mechanism for recovery of costs expended in the cleanup of waste disposal facilities. At the time the district court entered judgment,[9] section 107(a) provided in pertinent part:
 
 
 20
 (a) Covered persons; scope
 
 
 21
 Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--
 
 
 22
 ....
 
 
 23
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [and]
 
 
 24
 (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and
 
 
 25
 (4) ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--
 
 
 26
 (A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan.
 
 
 27
 42 U.S.C.A. Sec. 9607(a) (West Supp.1987).
 
 
 28
 In our view, the plain language of section 107(a) clearly defines the scope of intended liability under the statute and the elements of proof necessary to establish it.[10] We agree with the overwhelming body of precedent that has interpreted section 107(a) as establishing a strict liability scheme.[11] Further, in light of the evidence presented here, we are persuaded that the district court correctly held that the governments satisfied all the elements of section 107(a) liability as to both the site-owners and the generator defendants.
 
 A. Site-Owners' Liability
 
 29
 In light of the strict liability imposed by section 107(a), we cannot agree with the site-owners contention that they are not within the class of owners Congress intended to hold liable. The traditional elements of tort culpability on which the site-owners rely simply are absent from the statute. The plain language of section 107(a)(2) extends liability to owners of waste facilities regardless of their degree of participation in the subsequent disposal of hazardous waste.
 
 
 30
 Under section 107(a)(2), any person who owned a facility at a time when hazardous substances were deposited there may be held liable for all costs of removal or remedial action if a release or threatened release[12] of a hazardous substance occurs. The site-owners do not dispute their ownership of the Bluff Road facility, or the fact that releases occurred there during their period of ownership. Under these circumstances, all the prerequisites to section 107(a) liability have been satisfied.[13] See Shore Realty, 759 F.2d at 1043-44 (site-owner held liable under CERCLA section 107(a)(1) even though he did not contribute to the presence or cause the release of hazardous substances at the facility).[14]
 
 
 31
 The site-owners nonetheless contend that the district court's grant of summary judgment improperly denied them the opportunity to present an affirmative defense under section 107(b)(3). Section 107(b)(3) sets forth a limited affirmative defense based on the complete absence of causation. See Shore Realty, 759 F.2d at 1044. It requires proof that the release or threatened release of hazardous substances and resulting damages were caused solely by "a third party other than ... one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant...." 42 U.S.C. Sec. 9607(b)(3). A second element of the defense requires proof that the defendant "took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions." Id. We agree with the district court that under no view of the evidence could the site-owners satisfy either of these proof requirements.
 
 
 32
 First, the site-owners could not establish the absence of a direct or indirect contractual relationship necessary to maintain the affirmative defense. They concede they entered into a lease agreement with COCC. They accepted rent from COCC, and after SCRDI was incorporated, they accepted rent from SCRDI. See United States v. Northernaire Plating Co., 670 F.Supp. 742, 747-48 (W.D.Mich.1987) (owner who leased facility to disposing party could not assert affirmative defense). Second, the site-owners presented no evidence that they took precautionary action against the foreseeable conduct of COCC or SCRDI. They argued to the trial court that, although they were aware COCC was a chemical manufacturing company, they were completely ignorant of all waste disposal activities at Bluff Road before 1977. They maintained that they never inspected the site prior to that time. In our view, the statute does not sanction such willful or negligent blindness on the part of absentee owners. The district court committed no error in entering summary judgment against the site-owners.
 
 B. Generator Defendants' Liability
 
 33
 The generator defendants first contend that the district court misinterpreted section 107(a)(3) because it failed to read into the statute a requirement that the governments prove a nexus between the waste they sent to the site and the resulting environmental harm. They maintain that the statutory phrase "containing such hazardous substances" requires proof that the specific substances they generated and sent to the site were present at the facility at the time of release. The district court held, however, that the statute was satisfied by proof that hazardous substances "like" those contained in the generator defendants' waste were found at the site. SCRDI, 653 F.Supp. at 991-92. We agree with the district court's interpretation.
 
 
 34
 Reduced of surplus language, sections 107(a)(3) and (4) impose liability on off-site waste generators who:
 
 
 35
 "arranged for disposal ... of hazardous substances ... at any facility ... containing such hazardous substances ... from which there is a release ... of a hazardous substance."
 
 
 36
 42 U.S.C.A. Secs. 9607(a)(3), (4) (West Supp.1987) (emphasis supplied). In our view, the plain meaning of the adjective "such" in the phrase "containing such hazardous substances" is "[a]like, similar, of the like kind." Black's Law Dictionary 1284 (5th ed. 1979). As used in the statute, the phrase "such hazardous substances" denotes hazardous substances alike, similar, or of a like kind to those that were present in a generator defendant's waste or that could have been produced by the mixture of the defendant's waste with other waste present at the site. It does not mean that the plaintiff must trace the ownership of each generic chemical compound found at a site. Absent proof that a generator defendant's specific waste remained at a facility at the time of release, a showing of chemical similarity between hazardous substances is sufficient.[15]
 
 
 37
 The overall structure of CERCLA'S liability provisions also militates against the generator defendants' "proof of ownership" argument. In Shore Realty, the Second Circuit held with respect to site-owners that requiring proof of ownership at any time later than the time of disposal would go far toward rendering the section 107(b) defenses superfluous. Shore Realty, 759 F.2d at 1044. We agree with the court's reading of the statute and conclude that its reasoning applies equally to the generator defendants' contentions. As the statute provides--"[n]otwithstanding any other provision or rule of law"--liability under section 107(a) is "subject only to the defenses set forth" in section 107(b). 42 U.S.C.A. Sec. 9607(a) (West Supp.1987) (emphasis added). Each of the three defenses[16] established in section 107(b) "carves out from liability an exception based on causation." Shore Realty, 759 F.2d at 1044. Congress has, therefore, allocated the burden of disproving causation to the defendant who profited from the generation and inexpensive disposal of hazardous waste. We decline to interpret the statute in a way that would neutralize the force of Congress' intent.[17]
 
 
 38
 Finally, the purpose underlying CERCLA's liability provisions counsels against the generator defendants' argument. Throughout the statute's legislative history, there appears the recurring theme of facilitating prompt action to remedy the environmental blight of unscrupulous waste disposal.[18] In deleting causation language from section 107(a), we assume as have many other courts, that Congress knew of the synergistic and migratory capacities of leaking chemical waste, and the technological infeasibility of tracing improperly disposed waste to its source.[19] In view of this, we will not frustrate the statute's salutary goals by engrafting a "proof of ownership" requirement, which in practice, would be as onerous as the language Congress saw fit to delete. See United States v. Wade, 577 F.Supp. 1326, 1332 (E.D.Pa.1983) ("To require a plaintiff under CERCLA to 'fingerprint' wastes is to eviscerate the statute.").
 
 
 39
 The generator defendants next argue that the trial court ignored evidence that established genuine factual issues as to the existence of an affirmative defense to liability. They maintain that summary judgment was inappropriate because they presented some evidence that all of their waste had been removed from Bluff Road prior to cleanup. We agree with the trial court, however, that the materials on which the generator defendants rely were insufficient to create a genuine issue of material fact.
 
 
 40
 The generator defendants offered only conclusory allegations, principally based "on information and belief," that their waste, originally deposited at Bluff Road, was at some time prior to 1979 transported from that facility to other sites operated by SCRDI.[20] To withstand summary judgment under section 107(b)(3), however, the generator defendants had to produce specific evidence creating a genuine issue that all of their waste was removed from the site prior to the release of hazardous substances there. See 42 U.S.C. Sec. 9607(b)(3).[21] In light of the uncontroverted proof that containers bearing each of the defendants' markings remained present at the site at the time of cleanup and the fact that hazardous substances chemically similar to those contained in the generators' waste were found, the generator defendants' affidavits and deposition testimony simply failed to establish complete removal as a genuine issue. See Celotex v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (summary judgment appropriately granted against nonmoving party who failed to produce evidence supporting an element essential to its case on which it bore burden of proof at trial).
 
 III.
 
 41
 The appellants next challenge the district court's imposition of joint and several liability for the governments' response costs.[22] The court concluded that joint and several liability was appropriate because the environmental harm at Bluff Road was "indivisible" and the appellants had "failed to meet their burden of proving otherwise." SCRDI, 653 F.Supp. at 994. We agree with its conclusion.
 
 
 42
 While CERCLA does not mandate the imposition of joint and several liability, it permits it in cases of indivisible harm. See Shore Realty, 759 F.2d at 1042 n. 13; United States v. ChemDyne, 572 F.Supp. 802, 810-11 (S.D.Ohio 1983). In each case, the court must consider traditional and evolving principles of federal common law,[23] which Congress has left to the courts to supply interstitially.
 
 
 43
 Under common law rules, when two or more persons act independently to cause a single harm for which there is a reasonable basis of apportionment according to the contribution of each, each is held liable only for the portion of harm that he causes. Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 260 n. 8, 99 S.Ct. 2753, 2756 n. 8, 61 L.Ed.2d 521 (1979). When such persons cause a single and indivisible harm, however, they are held liable jointly and severally for the entire harm. Id. (citing Restatement (Second) of Torts Sec. 433A (1965)). We think these principles, as reflected in the Restatement (Second) of Torts, represent the correct and uniform federal rules applicable to CERCLA cases.
 
 Section 433A of the Restatement provides:
 
 44
 (1) Damages for harm are to be apportioned among two or more causes where
 
 
 45
 (a) there are distinct harms, or
 
 
 46
 (b) there is a reasonable basis for determining the contribution of each cause to a single harm.
 
 
 47
 (2) Damages for any other harm cannot be apportioned among two or more causes.
 
 
 48
 Restatement (Second) of Torts Sec. 433A (1965).
 
 
 49
 Placing their argument into the Restatement framework, the generator defendants concede that the environmental damage at Bluff Road constituted a "single harm," but contend that there was a reasonable basis for apportioning the harm. They observe that each of the off-site generators with whom SCRDI contracted sent a potentially identifiable volume of waste to the Bluff Road site, and they maintain that liability should have been apportioned according to the volume they deposited as compared to the total volume disposed of there by all parties. In light of the conditions at Bluff Road, we cannot accept this method as a basis for apportionment.
 
 
 50
 The generator defendants bore the burden of establishing a reasonable basis for apportioning liability among responsible parties. Chem-Dyne, 572 F.Supp. at 810; Restatement (Second) of Torts Sec. 433B (1965).[24] To meet this burden, the generator defendants had to establish that the environmental harm at Bluff Road was divisible among responsible parties. They presented no evidence, however, showing a relationship between waste volume, the release of hazardous substances, and the harm at the site.[25] Further, in light of the commingling of hazardous substances, the district court could not have reasonably apportioned liability without some evidence disclosing the individual and interactive qualities of the substances deposited there. Common sense counsels that a million gallons of certain substances could be mixed together without significant consequences, whereas a few pints of others improperly mixed could result in disastrous consequences.[26] Under other circumstances proportionate volumes of hazardous substances may well be probative of contributory harm.[27] In this case, however, volume could not establish the effective contribution of each waste generator to the harm at the Bluff Road site.
 
 
 51
 Although we find no error in the trial court's imposition of joint and several liability, we share the appellants' concern that they not be ultimately responsible for reimbursing more than their just portion of the governments' response costs.[28] In its refusal to apportion liability, the district court likewise recognized the validity of their demand that they not be required to shoulder a disproportionate amount of the costs. It ruled, however, that making the governments whole for response costs was the primary consideration and that cost allocation was a matter "more appropriately considered in an action for contribution between responsible parties after plaintiff has been made whole." SCRDI, 653 F.Supp. at 995 & n. 8. Had we sat in place of the district court, we would have ruled as it did on the apportionment issue, but may well have retained the action to dispose of the contribution questions. See 42 U.S.C.A. Sec. 9613(f) (West Supp.1987). That procedural course, however, was committed to the trial court's discretion and we find no abuse of it. As we have stated, the defendants still have the right to sue responsible parties for contribution, and in that action they may assert both legal and equitable theories of cost allocation.[29]
 
 IV.
 
 52
 The generator defendants raise numerous constitutional challenges to the district court's interpretation and application of CERCLA. They contend that the imposition of "disproportionate" liability without proof of causation violated constitutional limitations on retroactive statutory application and that it converted CERCLA into a bill of attainder and an ex post facto law. They further assert, along with the site-owners, that the trial court's construction of CERCLA infringed their substantive due process rights.
 
 
 53
 The district court held that CERCLA does not create retroactive liability, but imposes a prospective obligation for the post-enactment environmental consequences of the defendants' past acts. SCRDI, 653 F.Supp. at 996. Alternatively, the court held that even if CERCLA is understood to operate retroactively, it nonetheless satisfies the dictates of due process because its liability scheme is rationally related to a valid legislative purpose. Id. at 997-98. We agree with the court's latter holding, and we find no merit to the generator defendants' bill of attainder and ex post facto arguments.[30]
 
 
 54
 Many courts have concluded that Congress intended CERCLA's liability provisions to apply retroactively to pre-enactment disposal activities of off-site waste generators. They have held uniformly that retroactive operation survives the Supreme Court's tests for due process validity.[31] We agree with their analyses.
 
 
 55
 In Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), the Supreme Court, in a different context, rejected a due process challenge to the retroactive operation of the liability provisions in the Black Lung Benefits Act of 1972. The Court stated that "a presumption of constitutionality" attaches to "legislative Acts adjusting the burdens and benefits of economic life," and that "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." Id. at 15, 96 S.Ct. at 2892. It reasoned that although the Act imposed new liability for disabilities developed prior to its enactment, its operation was "justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor." Id. at 18, 96 S.Ct. at 2893.[32]
 
 
 56
 The reasoning of Turner Elkhorn applies with great force to the retroactivity contentions advanced here. While the generator defendants profited from inexpensive waste disposal methods that may have been technically "legal" prior to CERCLA's enactment, it was certainly foreseeable at the time that improper disposal could cause enormous damage to the environment. CERCLA operates remedially to spread the costs of responding to improper waste disposal among all parties that played a role in creating the hazardous conditions. Where those conditions are indivisible, joint and several liability is logical, and it works to ensure complete cost recovery. We do not think these consequences are "particularly harsh and oppressive," United States Trust Co. v. New Jersey, 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92 (1977) (retrospective civil liability not unconstitutional unless it is particularly harsh and oppressive), and we agree with the Eighth Circuit that retroactive application of CERCLA does not violate due process. United States v. Northeastern Pharmaceutical & Chemical Co., Inc., 810 F.2d 726, 734 (8th Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987).
 
 
 57
 Nor does the imposition of strict, joint and several liability convert CERCLA into a bill of attainder or an ex post facto law. United States v. Conservation Chemical Co., 619 F.Supp. 162, 214 (W.D.Mo.1985); United States v. Tyson, 25 Env't.Rep.Cas. (BNA) 1897 (E.D.Pa.1986) [available on WESTLAW, 1986 WL 9250]. The infliction of punishment, either legislatively or retrospectively, is a sine qua non of legislation that runs afoul of these constitutional prohibitions. See Nixon v. Administrator of General Services, 433 U.S. 425, 473-84, 97 S.Ct. 2777, 2805-11, 53 L.Ed.2d 867 (1977) (bill of attainder analysis); Weaver v. Graham, 450 U.S. 24, 28-30, 101 S.Ct. 960, 963-65, 67 L.Ed.2d 17 (1981) (ex post facto law analysis). CERCLA does not exact punishment. Rather it creates a reimbursement obligation on any person judicially determined responsible for the costs of remedying hazardous conditions at a waste disposal facility. The restitution of cleanup costs was not intended to operate, nor does it operate in fact, as a criminal penalty or a punitive deterrent. Cf. Tull v. United States, 481 U.S. 412, 107 S.Ct. 1831, 1838, 95 L.Ed.2d 365 (1987) (distinguishing civil penalties under Clean Water Act from equitable remedy of restitution). Moreover, as this case amply demonstrates, Congress did not impose that obligation automatically on a legislatively defined class of persons.[33]
 
 V.
 
 58
 The United States contends on cross-appeal that the district court erred in denying its request for prejudgment interest on its response costs. At the time the court issued its decision, CERCLA contained no explicit provision for the award of prejudgment interest.[34] Since then, however, Congress has added the following language to section 107(a):
 
 
 59
 The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26. For purposes of applying such amendments to interest under this subsection, the term "comparable maturity" shall be determined with reference to the date on which interest accruing under this subsection commences.
 
 
 60
 42 U.S.C.A. 9607(a) (West Supp.1987). Because of this addition to the law, we look to the Supreme Court's decision in Bradley v. Richmond School Board, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), for the principles controlling application of later-enacted amendments to previously accrued statutory liability. We conclude under Bradley that the case must be remanded for reconsideration of the interest question pursuant to the terms of amended statute.
 
 
 61
 In Bradley, the Supreme Court ruled that when Congress amends a law while a case is pending on direct appeal, the general rule is that the appellate court should apply the law as amended unless so doing would result in manifest injustice or would contravene statutory direction or legislative history to the contrary[35]. Id. at 711, 94 S.Ct. at 2016; see Nilson Van & Storage Co. v. Marsh, 755 F.2d 362, 365 (4th Cir.), cert. denied, 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985). Here, the language and legislative history of the 1986 amendment reveal no statutory direction or congressional intent to delay its application,[36] and the defendants have failed to demonstrate any "manifest injustice" that would arise from its immediate operation.
 
 
 62
 The generator defendants contend, however, that Congress' use of the word "shall" in the phrase "amounts recoverable ... shall include interest" does not of itself make the award of interest mandatory. Following fourth circuit precedent, we must agree with this contention as far as it goes. See generally United Hospital Center, Inc. v. Richardson, 757 F.2d 1445, 1453 (4th Cir.1985) ("in a proper case 'shall' may properly be construed as permissive"). We think, however, in light of CERCLA's restitutional purposes and Congress' intent to facilitate complete reimbursement, the amendment generally establishes interest as an element of recovery--"absent a convincing argument to the contrary." Sterling Forest Associates v. Barnett-Range Corp., 840 F.2d 249, 252 (4th Cir.1988). Such an argument should be made in the first instance to the district court. Accordingly, we must remand the case for reconsideration of the interest question under the terms and purposes sought to be achieved by the amended statute.
 
 VI.
 
 63
 In view of the above, the judgment of the district court as to the CERCLA liability of the site-owners and generator defendants is affirmed. The case is remanded, however, for reconsideration of the question of prejudgment interest.
 
 
 64
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 65
 WIDENER, Circuit Judge, concurring and dissenting:
 
 
 66
 I concur in the majority opinion in all respects save its decision not to require the district court to treat the issue of allocation of costs of cleanup among the various defendants, at 172-173, and, as to that, I respectfully dissent. While it may be true that a subsequent suit for contribution may adequately apportion the damages among the defendants, I am of opinion that the district court, as a court of equity, is required to retain jurisdiction and answer that question now.
 
 
 67
 So far as I know, it is now and has been the general law without any variance that when a court of equity has jurisdiction it "will decide all matters in dispute and decree complete relief," e.g. Alexander v. Hillman, 296 U.S. 222, 242, 56 S.Ct. 204, 211, 80 L.Ed. 192 (1935), see Pomeroy's Equity Jurisprudence, 3rd Ed (1905) Sec. 181, 231, and that a court of equity should dispose of a case "so as to end litigation, not to foster it; to diminish suits, not to multiply them." Payne v. Hook, 74 U.S. (7 Wall) 425, 432, 19 L.Ed. 260, 262 (1869). In Payne, a case which should control here, even if the statute does not, the Supreme Court held that once a court of equity had jurisdiction to determine liability for an estate administrator's misconduct, it also had the duty to determine the amount the sureties would pay in the event the administrator could not satisfy the judgment. In the face of the admitted liability of the sureties in a separate action at law, 19 L.Ed. at 262, the Court nevertheless required the lower court in equity to ascertain the liability of the sureties in the same suit in order that the matter, should the administrator be unable to pay, not be "... turned over to a court of law, to renew the litigation with his sureties." 19 L.Ed. at 262. Thus, almost the same situation pertained in Payne which is present here, but with opposite result.
 
 
 68
 I see great danger in postponing the ultimate apportioning of the damages to a later day. As an example, a small generator which deposited a few gallons of relatively innocuous waste liquid at a site is jointly and severally liable for the entire cost of cleanup under this decision. And with that I agree. If that generator were readily available and solvent, however, the government might well, and probably would, proceed against him first in collecting its judgment. The vagaries of and delays in his subsequent suit for contribution might result in needless financial disaster. I do not see this as a desired or even permissible result.
 
 
 69
 The statute involved, 42 U.S.C. 9613(f)(1), provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title during or following any civil action under section 9606 of this title or under section 9607(a) of this title." (Italics added) Thus, the statute plainly provides that discretion with respect to contribution is not in the district court to consider relief or not as the majority opinion holds; rather, it is in the generator to seek relief, for "any person" certainly includes the generators of the waste. So, since the matter was brought before the district court, that court had no discretion but to decide the question.[1] To repeat, the discretion is in the party to make the claim, not in the district court to defer decision. While I agree that the claims may be asserted in a separate action, if they are asserted in the main case they must be decided.
 
 
 70
 Section 9613(f)(1) is entirely in accord with Payne, and I think we make a mistake of no little consequence in deciding that the district court has the discretion either to decide the matter before it or to relegate the parties to a separate suit.
 
 
 71
 Not only do the statute and federal procedural law require the course I have suggested, I think that the interests of justice as well as judicial economy are best served by proceeding in that manner.
 
 
 
 [1]
 Originally a named generator defendant in this case, Aquair Corporation has entered into a settlement agreement with the plaintiffs
 
 
 [2]
 The federal instrumentalities that contracted with SCRDI included the Environmental Protection Agency, the Army, the Air Force, and the Center for Disease Control. The South Carolina Department of Health and Environmental Control also contracted with SCRDI for waste disposal
 
 
 [3]
 This incident sparked substantial publicity, and the site-owners concede that as of June 1977 they were aware of hazardous waste disposal activities taking place on their Bluff Road property
 
 
 [4]
 The term "hazardous substance" is defined in section 101(14) of CERCLA, 42 U.S.C.A. Sec. 9601(14) (West Supp.1987). The definition incorporates by reference the substances listed as hazardous or toxic under the Clean Water Act, 33 U.S.C.A. Secs. 1317(a), 1321(b)(2)(a) (West 1986), the Clean Air Act, 42 U.S.C. Sec. 7412(b), the Resource Conservation and Recovery Act of 1976, 42 U.S.C.A. Sec. 6921 (West 1983 & Supp.1987), and the Toxic Substances Control Act, 15 U.S.C. Sec. 2606. Section 102(a) of CERCLA also authorizes EPA to list additional substances that "may present substantial danger to the public health or welfare or the environment." 42 U.S.C.A. Sec. 9602(a) (West Supp.1987)
 
 
 [5]
 It is undisputed that hazardous substances of the sort contained in each of the generator defendants' waste materials were found at the site. These substances included 1,1,1-Trichloroethane, acetone, phenol, cresol (methyl phenol), chlorophenol, and 2,4-dichlorophenol
 
 
 [6]
 Section 101(25) of CERCLA provides that " 'respond' or 'response' means remove, removal, remedy, and remedial action, all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C.A. Sec. 9601(25) (West Supp.1987). The terms "remove" and "removal," and "remedy" and "remedial action" are in turn defined at sections 101(23) and 101(24), 42 U.S.C.A. Secs. 9601(23), (24) (West Supp.1987)
 
 
 [7]
 In its initial summary judgment order, the court refused to hold COCC liable for response costs. After subsequent proceedings, however, the court found that COCC was engaged in a joint venture with SCRDI and therefore shared its liability for the governments' costs. COCC has not appealed from that ruling
 
 
 [8]
 As one district court has stated, the statute provides the federal government with "the tools necessary for a prompt and effective response to problems of national magnitude resulting from hazardous waste disposal," and it evinces congressional intent "that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." United States v. Reilly Tar & Chemical Corp., 546 F.Supp. 1100, 1112 (D.Minn.1982)
 
 
 [9]
 Congress amended section 107(a) in 1986, Pub.L. No. 99-499, 100 Stat. 1628-30, 1692, 1693, 1705-06 (1986), but the changes are not material to the issues presented in this part of the appeal
 
 
 [10]
 Many courts have provided succinct analyses of CERCLA's legislative history, see generally Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1080-82 (1st Cir.1986); New York v. Shore Realty Corp., 759 F.2d 1032, 1039-42 (2d Cir.1985); United States v. Shell Oil Co., 605 F.Supp. 1064, 1068-79 (D.Colo.1985), which are instructive but need not be repeated here because of the clarity of the liability provisions at issue. See Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) ("Where ... resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.")
 
 
 [11]
 See, e.g., Levin Metals Corp. v. Parr-Richmond Terminal Co., 799 F.2d 1312, 1316 (9th Cir.1986); New York v. Shore Realty Corp., 759 F.2d 1032, 1042 (2d Cir.1985); Violet v. Picillo, 648 F.Supp. 1283, 1290 (D.R.I.1986) (and cases cited therein); see also United States v. Northeastern Pharmaceutical & Chemical Co., 810 F.2d 726, 732 n. 3 (8th Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) (dictum)
 In addition to the unanimous judicial viewpoint that Congress intended CERCLA liability to be strict, we observe that CERCLA section 101(32), 42 U.S.C.A. Sec. 9601(32) (West Supp.1987), provides that the standard of liability applicable to CERCLA actions shall be that which governs actions under section 311 of the Clean Water Act, 33 U.S.C. Sec. 1321. In Steuart Transportation Co. v. Allied Towing Corp., 596 F.2d 609, 613 (4th Cir.1979), we held that the standard of liability under section 311 is strict liability.
 
 
 [12]
 The statute defines "release" to include "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C.A. Sec. 9601(22) (West Supp.1987)
 
 
 [13]
 The site-owners' relative degree of fault would, of course, be relevant in any subsequent action for contribution brought pursuant to 42 U.S.C.A. Sec. 9613(f) (West Supp.1987). Congress, in the Superfund Amendments and Reauthorization Act of 1986, Pub.L. 99-499, Sec. 113, 100 Stat. 1613, 1647 (1986) [hereafter SARA], established a right of contribution in favor of defendants sued under CERCLA section 107(a). Section 113(f)(1) provides:
 Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or section 9607 of this title.
 42 U.S.C.A. Sec. 9613(f) (West Supp.1987). The legislative history of this amendment suggests that in arriving at an equitable allocation of costs, a court may consider, among other things, the degree of involvement by parties in the generation, transportation, treatment, storage, or disposal of hazardous substances. H.R.Rep. No. 253(III), 99th Cong., 1st Sess. 19 (1985), reprinted in 1986 U.S.Code Cong. & Admin.News 2835, 3038, 3042.
 
 
 [14]
 Congress, in section 101(35) of SARA, acknowledged that landowners may affirmatively avoid liability if they can prove they did not know and had no reason to know that hazardous substances were disposed of on their land at the time they acquired title or possession. 42 U.S.C.A. Sec. 9601(35) (West Supp.1987). This explicitly drafted exception further signals Congress' intent to impose liability on landowners who cannot satisfy its express requirements
 
 
 [15]
 CERCLA plaintiffs need not perform exhaustive chemical analyses of hazardous substances found at a disposal site. See SCRDI, 653 F.Supp. at 993 n. 6. They must, however, present evidence that a generator defendant's waste was shipped to a site and that hazardous substances similar to those contained in the defendant's waste remained present at the time of release. The defendant, of course, may in turn present evidence of an affirmative defense to liability
 
 
 [16]
 In addition to the limited third-party defense discussed above, sections 107(b)(1) and (2) respectively allow defendants to avoid liability by proving that the release and resulting damages were "caused solely" by an act of God or an act of war. 42 U.S.C. Sec. 9607(b)(1), (2)
 
 
 [17]
 In fact, Congress specifically declined to include a similar nexus requirement in CERCLA. As the Second Circuit in Shore Realty observed, an early House version of what ultimately became section 107(a) limited liability to "any person who caused or contributed to the release or threatened release." 759 F.2d at 1044 (quoting H.R.Rep. 7020, 96th Cong., 2d Sess. Sec. 3071(a) (1980), reprinted in 2 A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 at 438. As ultimately enacted after House and Senate compromise, however, CERCLA "imposed liability on classes of persons without reference to whether they caused or contributed to the release or threat of release." Shore Realty, 759 F.2d at 1044. The legislature thus eliminated the element of causation from the plaintiff's liability case. Id.; see also United States v. Bliss, 667 F.Supp. 1298, 1309 (E.D.Mo.1987) ("traditional tort notions, such as proximate cause, do not apply"); Violet v. Picillo, 648 F.Supp. 1283, 1290-93 (D.R.I.1986) (minimal causal nexus); United States v. Conservation Chemical Co., 619 F.Supp. 162, 190 (W.D.Mo.1985); United States v. Wade, 577 F.Supp. 1326, 1331-34 (E.D.Pa.1983)
 
 
 [18]
 The legislative history underlying the Superfund Amendments and Reauthorization Act of 1986 echoed this theme with even greater force than that underlying CERCLA's original enactment in 1980
 
 
 [19]
 In advancing their arduous proof requirements, the generator defendants make little mention of the fact that leaking chemicals may combine to form new compounds or escape into the atmosphere before proper response action can be taken. See cases cited supra note 17
 
 
 [20]
 The generator defendants offered the following materials:
 
 
 [1]
 An officer of the company that oversaw the final cleanup at Bluff Road testified that he did not know whether drums bearing Allied's label actually contained Allied's waste when they were removed from the site
 
 
 [2]
 An officer of EM Industries averred that SCRDI assured him prior to 1980 that none of EM Industries' waste had been deposited at Bluff Road
 
 
 [3]
 An officer of Monsanto averred that two of his employees inspected the site in 1979, and while they "did not explore all areas of the site, upon information and belief they did not observe any drums of material taken from [Monsanto's plant]."
 
 
 [4]
 An officer of Allied averred that SCRDI's site manager at Bluff Road told him in 1979 that all of Allied's waste was removed from the site before 1977
 None of these largely second-hand allegations were supported by evidence tending to show that any of the generators' waste materials were actually taken away from the site. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to avoid summary judgment]; there must be evidence on which the [finder of fact] could reasonably find for the [nonmoving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).
 
 
 [21]
 Had they produced such evidence, it would have created an issue as to whether the "release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by ... an act or omission of a third party." 42 U.S.C. Sec. 9607(b)(3)
 
 
 [22]
 The site-owners limit their joint and several liability argument to the contention that it is inequitable under the circumstances of this case, i.e., their limited degree of participation in waste disposal activities at Bluff Road. As we have stated, however, such equitable factors are relevant in subsequent actions for contribution. They are not pertinent to the question of joint and several liability, which focuses principally on the divisibility among responsible parties of the harm to the environment
 
 
 [23]
 As many courts have noted, a proposed requirement that joint and several liability be imposed in all CERCLA cases was deleted from the final version of the bill. See, e.g., Chem-Dyne, 572 F.Supp. at 806. "The deletion," however, "was not intended as a rejection of joint and several liability," but rather "to have the scope of liability determined under common law principles." Id. at 808. We adopt the Chem-Dyne court's thorough discussion of CERCLA's legislative history with respect to joint and several liability. We note that the approach taken in Chem-Dyne was subsequently confirmed as correct by Congress in its consideration of SARA's contribution provisions. See H.R.Rep. No. 253(I), 99th Cong.2d Sess., 79-80 (1985), reprinted in 1986 U.S.Code Cong. & Admin.News at 2835, 2861-62
 
 
 [24]
 Section 433(B)(2) of the Restatement provides:
 Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.
 Restatement (Second) of Torts Sec. 433(B)(2) (1965).
 
 
 [25]
 At minimum, such evidence was crucial to demonstrate that a volumetric apportionment scheme was reasonable. The governments presented considerable evidence identifying numerous hazardous substances found at Bluff Road. An EPA investigator reported, for example, that in the first cleanup phase RAD Services encountered substances "in every hazard class, including explosives such as crystallized dynamite and nitroglycerine. Numerous examples were found of oxidizers, flammable and nonflammable liquids, poisons, corrosives, containerized gases, and even a small amount of radioactive material." Under these circumstances, volumetric apportionment based on the overall quantity of waste, as opposed to the quantity and quality of hazardous substances contained in the waste would have made little sense
 
 
 [26]
 We agree with the district court that evidence disclosing the relative toxicity, migratory potential, and synergistic capacity of the hazardous substances at the site would be relevant to establishing divisibility of harm
 
 
 [27]
 Volumetric contributions provide a reasonable basis for apportioning liability only if it can be reasonably assumed, or it has been demonstrated, that independent factors had no substantial effect on the harm to the environment. Cf. Restatement (Second) of Torts Sec. 433A comment d, illustrations 4, 5 (1965)
 
 
 [28]
 The final judgment holds the defendants liable for slightly less than half of the total costs incurred in the cleanup, while it appears that the generator defendants collectively produced approximately 22% of the waste that SCRDI handled. Other evidence indicates that agencies of the federal government produced more waste than did generator defendant Monsanto, and suggests that the amounts contributed by the settling parties do not bear a strictly proportionate relationship to the total costs of cleaning the facility. We note, however, that a substantial portion of the final judgment is attributable to litigation costs. We also observe that the EPA has contributed upwards of $50,000 to the Bluff Road cleanup, and that any further claims against the EPA and other responsible government instrumentalities may be resolved in a contribution action pursuant to CERCLA section 113(f)
 
 
 [29]
 Contrary to the generator defendants' request, it would be premature for us to interpret the effect of settlement on the rights of nonsettling parties in contribution actions under CERCLA section 113(f)(2), 42 U.S.C.A. Sec. 9613(f)(2) (West Supp.1987). We observe, however, that the possibility this subsection precludes contribution actions against settling parties signals legislative policy to encourage settlement in CERCLA cleanup actions. At the same time, we recognize that the language of CERCLA's new contribution provisions reveals Congress' concern that the relative culpability of each responsible party be considered in determining the proportionate share of costs each must bear
 
 
 [30]
 The generator defendants also assert, for the first time on appeal, that the district court's interpretation of CERCLA violated the separation of powers doctrine. They argue that the court's imposition of strict liability without proof of factual causation departed from Congress' intent, and that the court strayed from common-law principles in holding the defendants jointly liable. These arguments constitute little more than a repackaging of the statutory interpretation contentions we have already considered and rejected. Because we perceive no exceptional circumstances, we decline to review the separation of powers contention de novo
 
 
 [31]
 See, e.g., United States v. Northeastern Pharmaceutical & Chemical Co., Inc., 810 F.2d 726, 732-34 (8th Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) (NEPACCO ); United States v. Hooker Chemicals & Plastics Corp., 680 F.Supp. 546 (W.D.N.Y.1988); United States v. Shell Oil Co., 605 F.Supp. 1064, 1069-73 (D.Colo.1985). These decisions hold that CERCLA's legislative history and the past-tense language of section 107(a) evince congressional intent to apply CERCLA retroactively
 
 
 [32]
 Similarly, in Pension Benefit Guaranty Corp. v. R.A. Gray & Co., the Court stated:
 Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.
 ....
 ... [Due process is satisfied] simply by showing that the retroactive application is itself justified by a rational legislative purpose.
 467 U.S. 717, 729, 730, 104 S.Ct. 2709, 2717, 2718, 81 L.Ed.2d 601 (1984).
 
 
 [33]
 The existence of joint and several liability in cases of indivisible harm does not transform an otherwise constitutional obligation into one that exacts punishment. "Where there are opportunities for contribution ... as well as for joinder or impleader of responsible parties (Fed.R.Civ.P. Rules 14, 20 and 21), it can hardly be said that imposition of joint and several liability would be unconstitutional." Conservation Chemical, 619 F.Supp. at 214-15
 
 
 [34]
 Although some courts had found implicit authority within section 107(e)(2), 42 U.S.C. Sec. 9607(e)(2), for awarding interest, the district court denied the government's request, concluding that the defendants had not sought to delay the litigation and had not been recalcitrant, deceptive or unreasonable
 
 
 [35]
 In Bradley, the district court granted an award of attorneys fees to civil rights plaintiffs, despite the absence of explicit statutory authorization. While the case was pending on appeal before this court, Congress authorized such fee awards in the Education Act Amendments of 1972. Although a majority of the en banc court reversed the award on other grounds, Bradley v. School Board, 472 F.2d 318 (4th Cir.1972) (en banc), Judge Winter in dissent stated that the new law should apply to cases pending on appeal. Id. at 335 (Winter, J. dissenting). In a unanimous reversal, the Supreme Court largely adopted the reasoning of Judge Winter's dissent
 
 
 [36]
 The Third Circuit in United States v. Union Gas Co., 832 F.2d 1343 (3rd Cir.1987), cert. granted, --- U.S. ----, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988) recently applied another section of the 1986 Superfund Amendments to a case that was pending on appeal when the amendments were enacted. The court stated, "[t]o the extent that the added language serves to 'clarify' CERCLA, it amounts to a subsequent declaration of congressional intent that deserves great weight." Id. at 1350 (citing Red Lion Broadcasting v. F.C.C., 395 U.S. 367, 380-82, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969))
 
 
 [1]
 In the unlikely event that there was not sufficient evidence before the district court, it should simply have required more evidence to be taken, or should on remand should my view have prevailed