UNITED STATES of America, Plaintiff,

v.

Royal N. HARDAGE, et al., Defendants.

ADVANCE CHEMICAL COMPANY, et al., Hardage Steering Committee Defendants and Third–Party Plaintiffs,

v.

ABCO, INC., et al., Third–Party Defendants.

No. CIV–86–1401–P.

United States District Court, W.D. Oklahoma.

May 23, 1990.

1502

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY UNDER CERCLA SECTIONS 106 AND 107

PHILLIPS, District Judge.

At issue is the plaintiff United States' motion for partial summary judgment on liability filed June 1, 1989. The United States seeks summary judgment against the following defendants on the issue of their liability under Sections 106(a) and 107(a) of CERCLA,[1] 42 U.S.C. §§ 9606(a) & 9607(a): Cato Oil and Grease Company; Dal-Worth Industries, Inc.;[2] Double Eagle Refining Co.; JOC Oil Exploration Company, Inc.; Oklahoma National Stock Yards Company; Rockwell International Corporation; and U.S. Pollution Control, Inc.[3] Seven corporate defendants responded in opposition.[4] Various parties filed a total of seventeen (17) briefs on the issues relating to liability. On February 2, 1990, this

---

[1]. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act ("SARA"), Pub.Law No. 99–499, 100 Stat. 1613 (1986), 42 U.S.C. §§ 9601–75.

[2]. The United States originally requested summary judgment against Dal-Worth Industries, Inc. ("Dal-Worth") under both Sections 107(a)(3) and (4) of CERCLA. On July 1, 1989, Dal-Worth stipulated to liability under Section 107(a)(4). No. CIV–86–1401–P (W.D.Okla. July 5, 1989, dkt. no. 1835). Accordingly, the United States requested withdrawal of its motion for partial summary judgment on liability against Dal-Worth under Section 107(a)(3), which was granted by Order of this Court dated July 27, 1989. No. CIV–86–1401–P (W.D.Okla. July 27, 1989, dkt. no. 1901).

[3]. The United States also filed its motion for partial summary judgment against L & S Bearing Company ("L & S Bearing"). L & S Bearing stipulated to liability on June 1, 1989, with Judgment of this Court entered on June 16, 1989. No. CIV–86–1401–P (W.D.Okla. June 1, 1989, dkt. no. 1772 and June 16, 1989, dkt. no. 1799). This court issued an Order allowing withdrawal of the United States' motion for partial summary judgment on liability against L & S Bearing. No. CIV–86–1401–P (W.D.Okla. June 16, 1989, dkt. no. 1809).

The United States also filed its motion for summary judgment against Powell Sanitation Services, Inc. ("Powell"). On April 13, 1990, the United States moved to voluntarily dismiss this case against Powell, which was approved by the

Court on April 18, 1990. No. CIV–86–1401–P (W.D.Okla. Apr. 13, 1990, dkt. no. 2569 and Apr. 18, 1990, dkt. no. 2603).

[4]. Cato Oil and Grease Company ("Cato") responded in opposition on June 30, 1989, incorporating by reference its motion for summary judgment and supporting brief filed June 1, 1989. The United States replied on June 14, 1989.

With permission of this Court, Dal-Worth Industries, Inc. ("Dal-Worth") responded in opposition on July 5, 1989.

Double Eagle Refining Company ("Double Eagle") responded in opposition on June 28, 1989. The United States replied on July 14, 1989.

JOC Oil Exploration Company, Inc. ("JOC") responded in opposition on July 3, 1989. The United States replied on July 14, 1989. With this Court's permission, JOC surreplied on August 14, 1989, and the United States responded to JOC's surreply on October 13, 1989.

Oklahoma National Stock Yards ("Stock Yards") responded in opposition on June 30, 1989. The United States replied on July 14, 1989. With this Court's permission, Stock Yards surreplied on August 9, 1989, and the United States responded to the surreply on September 20, 1989.

Rockwell International Corporation ("Rockwell") responded in opposition on June 23, 1989.

With this Court's permission, U.S. Pollution Control, Inc. ("USPCI") responded in opposition on July 5, 1989. The United States replied on July 14, 1989.

Court issued a Minute Order indicating the United States' motion for partial summary judgment on liability would be granted against all the above-listed defendants, except U.S. Pollution Control Inc.,[5] and that this written order would follow. For the reasons set forth below, the United States' motion for partial summary judgment on liability is GRANTED as to defendants Cato, Dal–Worth, Double Eagle, JOC, Rockwell and Stock Yards. The United States' motion for partial summary judgment on liability is DENIED as to defendant USPCI.

## I. FACTUAL BACKGROUND

The Hardage Site is located in rural McClain County, Oklahoma, approximately 15 miles southwest of Norman and ½ mile west of Criner. Hardage operated as a toxic waste disposal site from 1972 to 1980. During these years, in excess of an estimated 18,000,000 gallons of waste were disposed of at the Hardage Site. Approximately 400 companies generated the waste eventually disposed of at the Hardage Site.

On September 8, 1980 the United States Department of Justice ("DOJ") filed suit in *United States v. Royal N. Hardage,* ("*Hardage I*"), No. CIV–80–1031–W (W.D. Okla.) on behalf of the EPA against the Hardage Site owner pursuant to Section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973. Operations at the Site ceased in November, 1980. On December 13, 1982, Judge West entered findings of fact and conclusions of law in *Hardage I.* 18 Envtl.Rep.Cas. (BNA) 1687 (W.D.Okla.1982). The Court found contamination of soil and groundwater as well as releases of contaminants into the air. The Court's Order concluded that the Hardage Site was dangerous and found Royal N. Hardage individually liable for remedial action at Hardage. Partial judgment was entered in 1983, and *Hardage I* was dismissed in 1986.

The EPA continued to study the Hardage Site and prepared a Feasibility Study to evaluate alternative remedial actions from a technical, environmental and cost-effec-

tive perspective. The studies of the Hardage Site were conducted by the EPA in 1982, 1983, and 1984. These studies concluded substantial work would be necessary to remediate the Hardage Site. On or about December 4, 1984 the EPA notified numerous companies, pursuant to Section 104 of CERCLA, 42 U.S.C. § 9604, of their status as potentially responsible parties ("PRPs") pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607.

On June 25, 1986, DOJ filed this lawsuit. *United States v. Royal N. Hardage, et al.,* No. CIV–86–1401–P (W.D.Okla.). The complaint asserted claims against thirty-six (36) companies potentially responsible for health threats posed by the Hardage Site. Most of the companies allegedly shipped between 100,000 and 1,700,000 gallons of hazardous substances to the Hardage Site.

On November 10, 1988, twenty-four (24) of these primary defendants stipulated to liability under Sections 106 and 107 of CERCLA, with Judgment entered that date. No. CIV–86–1401–P (W.D.Okla. Nov. 10, 1988, dkt. no. 1553). By this stipulation, the defendants acknowledged they were liable for response costs of the United States under Section 107 and that they share responsibility for implementation of a remedial action for the Hardage Site under Section 106.

The United States now brings the current motion to establish liability of the remaining seven additional defendants who did not join in the stipulation of liability. By this motion, the United States requests this Court to find each named defendant a liable party under CERCLA Section 107(a), from which the United States is entitled to recover the response costs it has incurred, or may incur, in investigating and cleaning up contamination at the Hardage Site. In addition, the United States seeks an additional finding that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the Hard-

---

**5.** This Minute Order also reflected summary judgment would be denied against Powell Sanitation Services.

age Site, and that therefore these defendants are liable for injunctive relief under CERCLA Section 106(a).

## II. STANDARD FOR SUMMARY JUDGMENT

The facts presented to the court upon a motion for summary judgment must be construed in a light most favorable to the nonmoving party. *Board of Educ. v. Pico,* 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982); *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If there can be but one reasonable conclusion as to the material facts, summary judgment is appropriate. Only genuine disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Finally, the movant must show entitlement to judgment as a matter of law. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985); Fed.R.Civ.P. 56(c).

Although the Court must view the facts and inferences to be drawn from the record in the light most favorable to the nonmoving party, "even under this standard there are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chem. Co.,* 849 F.2d 1269, 1273 (10th Cir.1988). As stated by the Supreme Court, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

The Supreme Court articulated the standard to be used in summary judgment cases, emphasizing the "requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). A dispute is "genuine" "if a reasonable [fact-finder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The Court stated that the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12. "The mere existence of a scintilla of evidence in support of the [party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [party]." *Id.* at 252, 106 S.Ct. at 2512.

## III. UNDISPUTED FACTS

Rule 14(B) of the Western District of Oklahoma provides a framework for determining undisputed facts at the summary judgment stage. The Rule provides:

> The brief in support of a motion for summary judgment (or partial summary judgment) shall begin with a section that contains a concise statement of material facts as to which movant contends no genuine issue exists. The facts shall be numbered and shall refer with particularity to those portions of the record upon which movant relies. The brief in opposition to a motion for summary judgment (or partial summary judgment) shall begin with a section which contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, shall state the number of the movant's fact that is disputed. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.

W.D.Okla.R. 14(B).

An analysis of the United States' motion and replies and the multiple responses and surreplies of the various defendants, reveals the following facts are undisputed within the meaning of Rule 14(B) for the purposes of this motion only. Fed.R.Civ.P. 56(e); W.D.Okla.R. 14(B):

1. Hazardous substances are located at the Hardage Site.

2. Hazardous substances have been released from the Hardage Site in to the soil and groundwater at, around and beneath the Hardage Site.

3. Hazardous substances from the Hardage Site have migrated from the Site and have contaminated or threaten to contaminate the Criner Creek/North Criner Creek alluvial aquifer.

4. The Criner Creek/North Criner Creek alluvial aquifer has been used and has the potential to be used as a source of drinking water for humans.

5. The United States has incurred costs of investigation and other activities in response to releases and threatened releases from the Hardage Site.

6. The President, through his delegated authority, has determined that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of the actual or threatened release of a hazardous substance from the Hardage Site.

7. Defendants Cato, Dal–Worth, Double Eagle, JOC, Rockwell, Stock Yards, and USPCI are corporations.

8. Defendant Dal–Worth accepted hazardous waste materials from industrial customers and transported those materials to the Hardage Site. Dal–Worth selected the Hardage Site as the site to which Dal–Worth transported the hazardous materials.

9. Dal–Worth transported xylene and trichloroethylene to the Hardage Site. These substances have been found at the Hardage Site.

10. Defendant USPCI collected waste material from industrial customers and transported these waste materials to the Hardage Site.

11. USPCI negotiated an agreement with Royal N. Hardage whereby USPCI paid Hardage for the privilege of disposing of industrial waste at the Hardage Site.

12. USPCI transported waste to the Hardage Site from McDonnell–Douglas Corp.'s Tulsa, Oklahoma facility.

13. The waste which USPCI transported to the Hardage Site from the McDonnell–Douglas facility included waste which contained phenols and methylene chloride.

14. Lowe Chemical Company ("Lowe") arranged for the transportation of styrene tar to the Hardage Site for disposal.

15. The styrene tar which Lowe sent to the Hardage Site contained toluene and ethyl benzene.

16. Toluene and ethyl benzene have been found at the Hardage Site.

17. On July 10, 1975, JOC Oil Aromatics acquired one hundred percent of the stock of Lowe.

18. On or about July 24, 1975, Lowe was renamed JOC Oil Recovery, Inc.

19. On or about September 13, 1976, JOC Oil Recovery, Inc. was merged into JOC Oil Aromatics, Inc.

20. On or about January 17, 1978, JOC Oil Aromatics changed its name to Friendswood Oil Processing Corp.

21. On or about December 18, 1978, Friendswood Oil Processing Corp. merged into JOC Oil Exploration Company, Inc.

22. Double Eagle disposed of waste oil sludge at the Hardage Site.

23. The waste oil sludge which Double Eagle disposed of at the Hardage Site contained lead.

24. Lead has been found at the Hardage Site.

25. Cato arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substance at the Hardage Site.

26. Rockwell arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substance at the Hardage Site.

27. Stock Yards arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substance at the Hardage Site.

**1508**

IV. STATUTORY PROVISIONS AND ELEMENTS OF CERCLA LIABILITY

In 1980, Congress enacted CERCLA "as a comprehensive response to the problems of hazardous waste," *United States v. Bliss*, 667 F.Supp. 1298, 1304 (E.D.Mo. 1987), and to provide "an array of mechanisms to combat the increasingly serious problems of hazardous substance release." *United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1078 (1st Cir.1986)). Through CERCLA, Congress provided the federal government with tools for "prompt and effective response to hazardous waste problems and to force those responsible for creating [these] ... problems to bear the cost of their actions." *United States v. Bliss*, 667 F.Supp. at 1304. In addition, Congress authorized the government to respond to releases or threatened releases of hazardous substances into the environment and to recover clean-up and response costs. 42 U.S.C. §§ 9604(a) & 9607. Also, in enacting CERCLA Congress authorized federal district courts "to grant injunctive relief to protect public health and to facilitate clean-up activities." *United States v. Bliss*, 667 F.Supp. at 1304; 42 U.S.C. § 9606.

Section 107(a) of CERCLA provides in pertinent part:

(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a ... facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ... or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State ... not inconsistent with the national contingency plan ...

42 U.S.C. § 9607(a).

The language of this section "clearly defines the scope of intended liability and the elements of proof necessary to establish it." *United States v. Monsanto Co.*, 858 F.2d at 167. Certain of the requisite elements of a prima facie case under Section 107(a) relate to the site in general, while others relate to the individual defendants. With respect to the Hardage Site, the United States must establish:

1) the Hardage Site is a "facility";

2) a "release or a threatened release" of a "hazardous substance" from the Hardage Site has occurred or is occurring;

3) the release or threatened release has caused the United States to incur response costs.

In addition, to complete the prima facie case against each defendant, the United States must prove:

4) each defendant falls within one of the classes of liable persons described in Section 9607.

*Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1379 (8th Cir.1989).

If the United States establishes each of these elements and the defendants are unable to prove the applicability of one of the defenses listed under section 9607(b),[6] or

---

6. "To establish a defense to liability, a defendant must prove by a preponderance of the evidence that the release or threat of a release of a hazardous substance and the resulting damages 'were caused solely by—1) an act of God; (2) an act of war; [or] (3) an act or omission of a third party.'" 42 U.S.C. § 9607(b); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d at 668 n. 3.

some other applicable defense, the United States is entitled to summary judgment on the liability issue. *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d at 668.

■■■■ Liability under CERCLA is strict, without regard to the liable party's fault or state of mind. *United States v. Monsanto Co.,* 858 F.2d at 167–68; *United States v. Bliss,* 667 F.Supp. at 1304. This Court has already interpreted that CERCLA imposes joint and several liability on defendants. No. CIV–86–1401–P (W.D.Okla. Nov. 28, 1989, dkt. no. 2256). If the harm is indivisible, as at Hardage, each defendant is jointly and severally liable for the entire harm, unless the defendant can prove the harm is divisible and that there is a reasonable basis for apportioning it. *Id.* at 9; *United States v. Monsanto,* 858 F.2d at 171–73.

■■■ Section 106(a) provides no independent basis for liability. Therefore, to be entitled to relief under Section 106, the United States must prove liability under Section 107. *United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 194 (W.D. Mo.1985). However, once Section 107 liability is established, responsible defendants are also liable for injunctive relief under Section 106 where the United States proves "there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance" from a site. 42 U.S.C. § 9606(a); *United States v. A & F Materials Co.,* 578 F.Supp. 1249, 1257 (S.D.Ill. 1984).

## A. ESTABLISHMENT OF SITE SPECIFIC ELEMENTS

At page 12 of this Order, the Court noted that in order to establish liability under Section 107(a) of CERCLA, the United States must first establish the following elements which relate to the Hardage Site itself: 1) the Hardage Site is a "facility," 2) there has been a "release, or threatened release ... of a hazardous substance" from the Hardage Site, and 3) the United States has incurred "response costs" in responding to that release or threatened release. 42 U.S.C. § 9607. In addition, to establish liability under Section 106 of CERCLA, the United States must prove that because of the release or threatened release, "there may be an imminent and substantial endangerment to the public health or welfare or the environment." 42 U.S.C. § 9606.

The United States first contends this Court already determined the elements of liability under Sections 106 and 107 have been met concerning the Hardage Site. As authority, the United States cites Judge West's Order in *United States v. Hardage,* (*"Hardage I"*), 18 Envtl.Rep.Cas. (BNA) 1687 (W.D.Okla.1982).[7] The United States argues this Court's rulings in *Hardage I* are stare decisis in this action and are binding. *United States v. Bagley,* 659 F.Supp. 223, 227 (W.D.Wash.1987), *aff'd in part and rev'd in part,* 837 F.2d 371 (9th Cir.), *cert. denied,* 488 U.S. 924, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988).

Cato responds that stare decisis is inapplicable here because the doctrine applies only to determinations of law resolved by

7. In *Hardage I,* Judge West made the following conclusions of law, in pertinent part:

10. The Hardage site is a facility within the meaning of 42 U.S.C. § 9601(9).

. . . .

12. Wastes at the Hardage site are hazardous substances within the meaning of 42 U.S.C. § 9601(14).

13. The release of hazardous substances has actually occurred or threatens to occur from the Hardage facility within the meaning of 42 U.S.C. § 9601(22).

. . . .

17. The Court has determined from the evidence that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of the actual or threatened release within the meaning of 42 U.S.C. § 9606(a).

. . . .

19. Releases of hazardous substances, pollutants or contaminants from the Hardage facility into the environment have occurred, and are occurring, and threaten to occur within the meaning of 42 U.S.C. §§ 9601(22) and 9604(a), (b).

20. The United States has incurred and will continue to incur costs of investigation, cleanup, and response within the meaning of 42 U.S.C. §§ 9601(23), 9601(24), and 9601(25), 9604(a), (b) to respond to releases and threatened releases from the Hardage facility. *Id.*

final judgment. Cato contends *Hardage I* was terminated by dismissal without prejudice, and was not a final judgment on the merits. Cato further argues that the doctrines of res judicata and collateral estoppel are equally inapplicable here.

▮ The Court reviewed these three doctrines and recent Tenth Circuit and other opinions interpreting these doctrines. *Nord Sil–Flo Corp. v. Noble Materials, Inc.*, No. CIV–88–5–P (W.D.Okla. Dec. 16, 1988, dkt. no. 27); *Ten Mile Indus. Park v. Western Plains Serv. Corp.*, 810 F.2d 1518–23 (10th Cir.1987); *United States v. Bagley*, 659 F.Supp. at 227. Because *Hardage I* was resolved by dismissal, the Court finds the doctrines of stare decisis, res judicata, and collateral estoppel are inapplicable here, and the decisions in *Hardage I* do not bind this Court in this case.

▮ However, in addition to legal argument, the United States presented evidence to support these site-specific elements. The affidavits of Alan W. Tavenner and Dr. Kirk Brown show the presence at the Hardage Site of hazardous substances including toluene, xylene and 1,1,1 trichloroethane. United States' Brief at Exs. A & B. CERCLA defines a "facility" to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). In addition, toluene, xylene, and 1,1,1 trichloroethane are listed as hazardous substances for which CERCLA liability may exist. 42 U.S.C. § 9601(14); 40 C.F.R. Table 302.4. No defendant presented evidence to dispute these sworn affidavits. Therefore, the evidence and the undisputed fact it supports are deemed admitted for purposes of this motion. W.D.Okla.R. 14(B). Accordingly, the Court finds the United States has established that the Hardage Site is a "facility."

▮ The affidavits of Alan Tavenner and Dr. Kirk Brown also show the presence of hazardous substances in the soil, surface water, and groundwater at and around the Hardage Site. United States' Brief at Exs. A & B. CERCLA defines a "release" to include "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). The presence of hazardous substances in the soil, surface water, or groundwater of a site demonstrates a release. See *United States v. Mottollo*, 695 F.Supp. 615, 623 (D.N.H.1988). No defendant presented evidence to dispute these sworn affidavits. Therefore, the evidence and the undisputed fact it supports are deemed admitted for purposes of this motion. W.D.Okla.R. 14(B). Accordingly, the Court finds the United States established a "release" of hazardous substances at the Hardage Site.

On December 8, 1989, this Court issued its Order Granting Plaintiff's Motion for Partial Summary Judgment on Response Costs. 733 F.Supp. 1424 (W.D.Okla.1989). The Order determined the United States had incurred at least $5,441,201.25 in response costs at the Hardage Site. Accordingly, the Court finds the United States has established the element of "response costs" incurred in connection with the Hardage Site.

▮ The United States also seeks summary judgment on the liability of each defendant for injunctive relief under Section 106 of CERCLA. Cato is the only defendant that contested liability under Section 106. Cato argued the United States' summary judgment motion for injunctive relief under CERCLA section 106 should be denied, because the United States "has not shown the absence of a genuine issue of material fact as to the existence of an imminent and substantial endangerment to health or the environment." Cato's Reply at 1. However, the United States presented the affidavit of Alan W. Tavenner which confirmed the presence of 1,1,1 trichloroethane, 1,1 dichloroethane, 1,1 dichloroethene, 1,2 transdichloroethene, tetrachloroethene, and trichloroethene, at the Site. United States' Brief at Ex. A. In addition, Dr. Kirk Brown's affidavit explains that "[l]arge quantities of toxic pollutants are traveling with the groundwater toward the North Criner Creek drinking water aquifer." United States' Brief at Ex.B. Brown further states that "[t]hese pollutants continue to migrate from the source area via

both surface and subsurface seepage as well as via air release from the facility," and "will continue to migrate from the source area through the subsoil to the alluvial aquifer." *Id.* Cato presented no evidence to dispute these sworn affidavits in the record. Therefore, the evidence and the undisputed fact it supports are deemed admitted for purposes of this motion. W.D.Okla.R. 14(B). Accordingly, the Court finds the United States established "an imminent and substantial endangerment may be presented by the release or threatened release of hazardous substances" from the Hardage Site still exist.

For the above reasons, the Court finds the United States has proved by a preponderance of the evidence the site-specific elements for liability under CERCLA Sections 106 and 107. 42 U.S.C. §§ 9606 & 9607.

Having proved the site-specific elements, the United States must now prove each defendant falls within one of the categories of covered persons contained in Section 107(a). 42 U.S.C. § 9607(a). In this instance, the United States must prove the defendants are either "generators" or "transporters."

### B. GENERATOR LIABILITY UNDER SECTION 107

█ "Generator" liability under section 107(a)(3) of CERCLA is imposed on "any person who by contract, agreement, or otherwise arranged for" disposal, treatment, or transport to a hazardous waste facility. 42 U.S.C. § 9607(a)(3). Courts have construed this CERCLA section broadly. A generator need not have selected the site. *United States v. Wade,* 577 F.Supp. 1326, 1333 & n. 3 (E.D.Pa.1983). Generator defendants can be liable for disposal of wastes at a particular site "even when defendants did not know the substance would be deposited at that site or in fact believed they would be deposited elsewhere." *United States v. Aceto Agric. Chem. Corp.,* 872 F.2d at 1381.

█ The United States need not trace the waste found at the site back to the wastes deposited by the generator. *United States v. Bliss,* 667 F.Supp. at 1310.

However, the United States must present evidence that a "generator defendant's waste was shipped to a site and that hazardous substances similar to those contained in the defendant's waste remained present at the time of the release." *United States v. Monsanto Co.,* 858 F.2d at 169 & n. 15. Liability under CERCLA does not depend upon any particular quantity of the hazardous substance. Even a *de minimis* contributor can be held liable. 42 U.S.C. § 9622(g).

Finally, the United States need not demonstrate that the specific hazardous substances contributed to the Hardage Site by the defendants have been released from the Site. The United States need only establish the release of "a" hazardous substance from the Hardage Site and "not necessarily one contained in the defendant's waste." *United States v. Wade,* 577 F.Supp. at 1333; 42 U.S.C. §§ 9606(a) & 9607(a)(4).

The United States seeks summary judgment on liability against five generators under CERCLA section 107(a)(3): Cato, Double Eagle, JOC, Rockwell and Stock Yards.

### C. TRANSPORTER LIABILITY UNDER SECTION 107

Liability of transporters is not as broad as the above-discussed generator liability. "Transporter" liability under Section 107(a)(4) of CERCLA is imposed on:

any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a)(4).

█ Transporters are liable under CERCLA if they selected the particular site for disposal of hazardous substances. *United States v. South Carolina Recycling & Disposal, Inc.,* 653 F.Supp. 984, 1005 (D.S.C.1984), *aff'd in part, vacated in part on other grounds sub nom., United States v. Monsanto Co.,* 858 F.2d 160 (4th

Cir.1988). In the following cases, federal courts have imposed liability against transporters under Section 107(a)(4). *United States v. Bliss,* 667 F.Supp. at 1307; *United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 175, 191 (W.D.Mo.1985); *United States v. Northeastern Pharm. & Chem. Co.,* ("NEPACCO"), 579 F.Supp. 823, 846–47 (W.D.Mo.1984), *aff'd in part and rev'd in part on other grounds,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. South Carolina Recycling & Disposal, Inc.,* 653 F.Supp. at 1005; *United States v. Parsons,* 723 F.Supp. 757, 759, 762 (N.D.Ga.1989).

Here the United States seeks summary judgment on liability against two transporters under CERCLA Section 107(a)(4): Dal–Worth and USPCI.

### V. LIABILITY OF INDIVIDUAL DEFENDANTS

#### A. CATO, DAL–WORTH, AND ROCKWELL

Cato, Dal–Worth and Rockwell each executed a stipulation acknowledging they either generated hazardous substances for disposal at the Hardage Site or selected the Hardage Site to which they transported hazardous substances. However, each stipulation reserved the right to contend that any or all provisions of CERCLA are invalid and unenforceable in violation of the United States Constitution. United States' Brief at Exs. COG–1 & RI–1; No. CIV–86–1401–P (W.D.Okla. July 5, 1989, dkt. no. 1835). Cato further reserved the right to contest the constitutionality of CERCLA on its face as well as applied, or, alternatively, that CERCLA does not permit the imposition of strict, retroactive, or joint and several liability on Cato.

Cato expansively asserted these arguments in a lengthy brief in support of its motion for summary judgment filed June 1, 1989. No. CIV–86–1401–P (W.D.Okla. June 1, 1989, dkt. no. 1773). In responding to the United States' motion for partial summary judgment on liability, Cato, Dal–Worth, and Rockwell each adopt the arguments and authorities raised in Cato's motion for summary judgment and supporting brief. The narrow thrust of their arguments is that it is unconstitutional to apply retroactive, strict, joint and several liability in the case of waste disposal conduct which was expressly permitted in Oklahoma.

This Court previously addressed Cato's arguments in its Order Denying Motion for Summary Judgment of Cato Oil & Grease Co. which was issued on November 28, 1989. No. CIV–86–1401–P (W.D.Okla. Nov. 28, 1989, dkt. no. 2256). The Court specifically adopts its reasoning stated in this previous Order.

Based upon the stipulations of Cato, Dal–Worth, and Rockwell, and the Court's rejection of their constitutionality arguments, the Court finds the United States' motion for partial summary judgment on liability should be GRANTED against Cato, Dal–Worth, and Rockwell.

#### B. DOUBLE EAGLE REFINING COMPANY

The United States also seeks summary judgment on liability against Double Eagle. From 1929, Double Eagle operated as a re-refiner of used motor oil in Oklahoma City. United States' Brief at Ex. DE–2. During 1975, as an example, Double Eagle processed between 400,000 to 450,000 gallons of waste motor oil into finished lubricating oil each month, for an approximate total of 8 million gallons that year. *Id.* The monthly processed oil generated approximately 60,000 gallons of waste oil sludge per month. *Id.* The sludge produced by Double Eagle contained:

5 to 8% emulsified oil, 40% asphalt carbon from decomposed motor oil, 10% dirt, and 40 to 60% metals (such as metal from automobile wear, *lead* from gasoline combustion, boron and other trace metals).

*Id.* at p. 2 (emphasis added). Double Eagle disposed of its waste oil sludge at the Hardage Site. *Id.* at Ex.DE–1. Lead has been detected at the Hardage Site in amounts several hundred times in excess of the trace levels naturally found in the soil in the area of Hardage. United States' Brief at Ex. A. Wastes in the main pit and sludge mound at Hardage contain high con-

centrations of lead. *Id.* Finally, lead is listed as a hazardous substance under CERCLA in 40 C.F.R. Table 302.4. Based upon these facts, the United States argues that liability of Double Eagle under Section 107(a)(3) is clear.[8]

Double Eagle responds that the United States presented no *admissible* evidence that lead was present in the waste sludge generated by Double Eagle. Double Eagle argues the deposition testimony of Cameron L. Kerran, upon which the United States' relies, based his opinion on "fact sheets" he received from the Association of Petroleum Re-refiners. United States' Brief at Ex.DE–3. Therefore, Double Eagle concludes, Kerran's opinion concerning the contents of the waste sludge generated by Double Eagle is clearly hearsay. In addition, Double Eagle further asserts Eugene Meyer's testimony that just because tetraethyl lead and tetramethyl lead were common additives in gasoline, during the relevant period, in no way constitutes evidence that the Double Eagle's waste contained lead.

■■■■ However, Double Eagle overlooks the letter written by Cameron L. Kerran to the Oklahoma State Department of Health on December 29, 1975. United States' Brief at Ex.DE–2. Kerran's letter verifies the tremendous volume of waste sludge produced by Double Eagle per month: 60,-000 gallons. United States' Brief at Ex. DE–2. In addition, Kerran's letter verifies that the characteristics and content of its sludge includes lead. *Id.* An admission by a party opponent is not hearsay if the "statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or . . . (C) a statement by a person authorized by the party to make a statement concerning the subject." Fed.R.Evid. 801(d)(2). Kerran wrote his December 29, 1975 letter in his capacity as President of Double Eagle. Therefore, the Court finds Double Eagle admitted through Kerran that its sludge contained lead. Having reached this determination, the Court need

not address Double Eagle's arguments regarding Eugene Meyer's affidavit.

Having found that Double Eagle's sludge contained lead, that lead is present at the Hardage Site, and lead is a hazardous substance under CERCLA, the Court finds the United States' motion for summary judgment against Double Eagle should be GRANTED.

## C. JOC OIL EXPLORATION COMPANY

### 1. SUCCESSOR LIABILITY

■■■ The United States also seeks summary judgment against JOC. Through a series of stock acquisitions and mergers detailed in the undisputed facts, JOC obtained control of what had been Lowe. JOC admits they are a successor by merger to Lowe. JOC's Response Brief at 9. As will be discussed in more detail later, JOC contends genuine issues of material fact exist as to whether Lowe, JOC's predecessor, shipped and disposed of hazardous wastes at the Hardage Site. However, assuming the Court finds Lowe did "arrange for" the disposal of hazardous substances at Hardage, an issue exists as to whether JOC as successor would also be liable.

In 1988, the Third Circuit specifically addressed the issue of corporate successor liability through merger transactions in the CERCLA context. *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). The *Smith* court made a lengthy analysis of corporate successor liability and its relation to CERCLA. The court concluded:

> [t]he concerns that have lead to a corporation's common law liability of a corporation for the torts of its predecessor are equally applicable to the assessment of responsibility for clean-up costs under CERCLA. The Act views response liability as a remedial, rather than a punitive, measure whose primary aim is to correct the hazardous condition. Just as there is

---

**8.** The United States originally asserted that Double Eagle's waste sent to Hardage also contained sulfuric acid. However, the United States withdrew its reference to the presence of sulphuric acid in the Double Eagle waste sent to the site, for purposes of its motions for summary judgment. United States' Response to Double Eagle's Opposition at 3.

liability for ordinary torts or contractual claims, the obligation to take necessary steps to protect the public should be imposed on a successor corporation.

*Id.* at 91. Having conducted the above analysis, the *Smith* court held "Congress intended to impose successor liability on corporations which either have merged with or have consolidated with a corporation that is a responsible party as defined in the Act." *Id.* at 92.

Therefore, the Court finds if evidence establishes Lowe is liable as a CERCLA generator, then JOC as a successor through merger is also liable for Lowe's violations of CERCLA.

### 2. LIABILITY OF LOWE

■ Lowe, a Texas corporation, was initially established to reprocess catalysts out of the Monsanto plant at Texas City, Texas. JOC's Response at Ex. H. In 1960 or 1961, Lowe set up a styrene tar plant at which styrene tar was reprocessed to recover toluene, ethyl benzene and cumene. United States' Brief at Ex. JOC–1. Lowe sent the styrene tar reprocessing waste materials to the Hardage Site. *Id.;* United States' Reply to JOC's Response at Ex. A & D. To support these facts, the United States included excerpts of deposition testimony given by Monroe Lee Sharp, plant superintendent at Lowe, and Ralph Lowe, owner of Lowe. United States' Brief at Ex. JOC–1; United States' Reply at Exs. A & D. The styrene tar waste contained toluene and ethyl benzene. United States' Brief at Ex. JOC–1. Toluene and ethyl benzene are listed as hazardous substances under CERCLA in 40 C.F.R. Table 302.4. Eltex Chemical Supply Company transported Lowe's waste to the Hardage Site, and Royal Hardage received shipments of styrene tar waste from Eltex. United States' Reply at Exs. A, F, G, & H. Checks drawn on Lowe's account paid Eltex for the disposal of waste at Hardage. United States' Reply at Exs. A, B, D & E. In addition, toluene and ethyl benzene have been detected at the Hardage Site in on-site sampling. United States' Brief at Ex. A. Based upon these facts, the United States argues Lowe was a party that "arranged for" the disposal of hazardous substances at the Hardage Site within the meaning of Section 107(a)(3) of CERCLA. 42 U.S.C. § 9607(a)(3).

In response JOC attempts to establish fact disputes as to whether hazardous wastes were actually shipped from Lowe's facility in Harris County, Texas. First, JOC contends that the operators at the Lowe plant, who signed the shipping orders by which Lowe's waste was transmitted to the Hardage Site, do not remember the shipments of materials to Hardage, or the name of the Hardage Site itself. JOC's Response at Ex. D. Next, JOC argues two of the operators, Arnulfo and Demetrio Gonzales, claim their deceased brother's signature was forged on certain bills of lading. *Id.* JOC argues the United States admits this information. JOC claims testimony of these operators conflicts with the deposition testimony of Monroe Sharp and, therefore, raises a fact issue as to whether the alleged shipments were made from Lowe to Hardage.

The Court reviewed the deposition testimony of Monroe Sharp, Ralph Lowe, and Arnulfo Gonzales. The Court finds that although the operators do not remember the shipments, Arnulfo Gonzales testified he signed certain of the bills of lading reflecting shipments of material from Lowe to Hardage. United States' Reply at Ex. I. In addition, Arnulfo Gonzales verifies that the signature on certain bills of lading is his, and that Monroe Sharp would have been in charge of the movement of waste materials. *Id.* The Court disagrees with JOC's conclusion concerning the conflict. The Court finds Gonazales' testimony to be consistent with Monroe Sharp's and Ralph Lowe's testimony. Therefore, the Court finds no genuine issue of material fact exists on this basis as to whether hazardous materials were actually transported to Hardage from Lowe.

JOC also argues a substantial question exists regarding the actual volume of hazardous waste material allegedly taken to the Hardage Site. To support this argument, JOC structures an elaborate analysis concerning the size of pits at Lowe and the amount of waste that could have been stored there. JOC concludes a total of

621,000 gallons would have been stored in the pits. JOC's Response at 8. JOC then argues 200,000 gallons of chemicals were shipped to Brazosport Industrial Services, Inc. JOC's Response at Ex.J. In addition, pursuant to a court-ordered clean-up in Texas, Lowe shipped another 286,000 gallons of waste to Ranger, Texas for disposal. JOC's Response at Ex. G. Therefore, JOC concludes that mathematically it would have been physically impossible for Lowe to have generated the amount of waste allegedly sent to Hardage, with the amounts of waste sent to other places. JOC Response at p. 7–9. However, this analysis illustrates the uncontroverted fact that at least 135,000 gallons could have been sent by Lowe to Hardage, which is consistent with the documentary evidence substantiating the shipment of Lowe to Hardage presented by the United States. "[W]hen an issue of fact is supported by affidavits or other evidence that admits of only one conclusion, the court may not draw an opposite conclusion merely on the basis of unsupported allegations." *Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1244 (3d Cir.1980).

In addition, Section 107(a)(3) of CERCLA contains no volume amount to establish liability. To establish Lowe's and therefore JOC's successor liability, the United States need only show Lowe sent *some* waste containing hazardous substances to the Hardage Site. Even *de minimis* defendants, persons who shipped small amounts of waste, can be liable. 42 U.S.C. § 9622(g). Accordingly, the Court finds the United States has established this element.

Lastly, JOC argues that shipments made from Lowe to Hardage, if any, were made by Ralph Lowe personally, not by Lowe Chemical. Therefore, JOC argues that any liability is therefore Ralph Lowe's, individually. *United States v. Northeastern Pharm. & Chem. Co.*, 810 F.2d at 734. However, the Court reviewed the evidence presented by JOC to support this contention, and finds it unpersuasive. Specifically, Monroe Sharp supervised transmittal of Lowe's wastes to Hardage, and checks to Eltex for transportation were drawn on Lowe's checking account, not on Ralph Lowe's personal account. Corporations can be held responsible for the acts of their agents within the scope of their employment. *New York Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481, 493, 29 S.Ct. 304, 306, 53 L.Ed. 613 (1909). JOC may well have a valid third-party action against Lowe, but it does not absolve JOC of liability in this instance.

The Court reviewed all of the evidence presented by both JOC and the United States on these issues, in the light most favorable to JOC, as required. The Court finds no genuine issues of material fact requiring denial of the United States' request for summary judgment on liability. The Court finds overwhelming evidence to support the facts necessary to establish Lowe's liability as a "generator" under CERCLA Section 107(a)(3). Accordingly, the Court finds summary judgment should be GRANTED on behalf of the United States against JOC as successor by merger of Lowe.

### D. U.S. POLLUTION CONTROL, INC.

U.S. Pollution Control, Inc. was formed in 1968 to provide complete industrial waste disposal services and waste transportation for its customers. USPCI's Response at Ex. A. During the times pertinent to this lawsuit, USPCI accepted waste materials from various companies for transportation and storage or disposal at three USPCI-owned facilities: 1) USPCI's Turkey Mountain storage facility in Tulsa, Oklahoma; 2) USPCI's Turkey Mountain deep-well injection facility in Tulsa; and 3) USPCI's Lone Mountain disposal facility in Waynoka, Oklahoma. United States' Brief at Ex. USP–1. In addition, USPCI also accepted waste materials from companies for transportation and disposal at the Hardage Site.

From 1972 through 1980, USPCI transported 550 shipments of waste materials to Hardage on behalf of 123 companies. United States' Brief at Ex. USP–1; USPCI Response at 6. Many of the shipments contained hazardous materials listed under CERCLA, 40 C.F.R. Table 302.4.

USPCI is the only transporter defendant against which the United States seeks sum-

mary judgment pursuant to 42 U.S.C. § 9607(a)(4) on the basis of the evidentiary record before the Court.[9] As earlier stated, CERCLA distinguishes between generator and transporter liability. Generators are liable under CERCLA if they merely "arranged for" the transportation or disposal of hazardous substances. 42 U.S.C. § 9607(a)(3). On the other hand, transporters are liable for the disposal of hazardous materials it transports if it selects the disposal site. 42 U.S.C. § 9607(a)(4).

The parties seek a determination by this Court of the correct meaning of "site selection" under Section 107(a)(4). First the United States argues a transporter, like USPCI, which has its own exclusive contractual arrangement with the disposal site, as USPCI did with Hardage here, proposes to customers that wastes should be sent to that site, and then transports it to the site, has selected the site. The United States also contends the transporter at least participated in or assisted in the site selection. Under the authority of *United States v. NEPACCO*, 579 F.Supp. at 846–47, and *United States v. Bliss*, 667 F.Supp. at 1307, the United States urges the Court to find USPCI liable for having selected the site, or at least having participated in the site selection.

First, USPCI contends that at all times relevant USPCI operated as a common carrier within the State of Oklahoma and that by their nature common carriers do not select the destinations of materials they transport. Therefore USPCI argues, it is entitled to judgment as a matter of law it did not select the Hardage Site within the meaning of Section 107(a)(4). To support this argument, USPCI incorporates by reference its brief in support of its own motion for summary judgment filed June 1, 1989.[10] No. CIV–86–1401–P (W.D.Okla. June 1, 1989, dkt. no. 1771).

■■■ USPCI explains that while CERCLA was under consideration by Congress, representatives of the transportation industry sought to have Congress exempt or except bona fide common carriers from liability under Section 107 of CERCLA. *Id.* at 8. USPCI claims the transportation industry was well pleased that the final version of Section 107(a)(4) required the transporter to have selected the site. USPCI then leaps to the conclusion that by the addition of the site-selection requirement in the final version of Section 107(a)(4), Congress created a statutory exemption for bona fide common carriers. However, USPCI provides the Court with no authority for this conclusion. Indeed, USPCI merely attaches the affidavit of the lobbyist who dealt with Congress on behalf of the transportation industry, Clifford J. Harvison, President of the National Tank Truck Carriers, Inc. *Id.* at Ex. G.

CERCLA in section 107(a)(4) is clear and unambiguous. It defines liability in terms of whether the transporter "selected" the site, not whether the transporter is a common carrier. Indeed, the words "common carrier" do not even appear within Section 107(a)(4). In addition, the only sections of CERCLA which do discuss common carriers, Section 101(20)(B) and (C), specifically refer to Sections 107(a)(3) and (4) as exceptions.[11]

---

**9.** The United States originally presented evidentiary materials in support of its request for summary judgment against two other transporters: Dal–Worth Industries and Powell Sanitation Services. As earlier stated at p. 1 n. 2, Dal–Worth stipulated to the elements of transporter liability under Section 107(a)(4) on July 5, 1989, preserving its CERCLA constitutionality argument. This Court rejected the constitutionality argument at page 18 of this Order and granted the United States' motion for summary judgment on liability against Dal–Worth.

In addition, this Court approved the United States' voluntary dismissal of this action against Powell Sanitation Services on April 18, 1990. No. CIV–86–1401–P (W.D.Okla. Apr. 18, 1990, dkt. no. 2603).

**10.** This Court denied USPCI's motion for summary judgment by Order issued October 3, 1989, on the basis of genuine issues of material fact as to whether USPCI selected the Hardage site. No. CIV–86–1401–P (W.D.Okla. Oct. 3, 1989, dkt. no. 2023).

**11.** CERCLA Sections 101(20)(B) provides:

(B) In the case of a hazardous substance which has been accepted for transportation by a common or contract carrier and except as provided in section 9607(a)(3) or (4) of this title, (i) the term "owner or operator" shall mean such common carrier or other bona fide for hire carrier acting as an independent contractor during such transportation, (ii) the

The Court is convinced that Congress did *not* intend to create an exemption for common carriers from transportation liability. The Court finds that site selection must be decided on a case-by-case basis. If a transporter selected the site, it is liable, regardless of whether it is a "common carrier."

Next, USPCI argues a transporter can only be liable if it acted alone in selecting the disposal site. In addition, USPCI contends it cannot be held liable as a transporter for a particular shipment unless the generator had no involvement in the selection. USPCI urges the Court to reject the United States' interpretation of *United States v. NEPACCO*, 579 F.Supp. at 846–47, and *United States v. Bliss*, 667 F.Supp. at 1307, and follow the clear language of the statute.

 Rather than present evidence involving shipments for many of USPCI's customers, for purposes of this summary judgment motion, the United States focuses on USPCI's shipments for two generators: McDonnell–Douglas and Honeywell. The evidentiary record presented by both the United States and USPCI in argument for and against summary judgment is voluminous. The Court speculates that at least 1,000 pages of documents were filed supporting both positions.

The United States contends the discovery record establishes instances where USPCI customers did not direct USPCI to transport their wastes to any particular site. Therefore, the decision to take the waste to Hardage rested solely with USPCI. Specifically, the United States asserts USPCI's transportation contract with McDonnell–Douglas, its attachments and amendments specify no disposal location. United States' Brief at Ex. USP–3. In addition, the United States contends that deposition testimony of McDonnell–Douglas employees shows McDonnell–Douglas was neither interested in, nor chose to exercise control over the identity of USPCI's disposal site. *Id.* at Exs. USP–4, –5, –6, & –7. The United States argues the testimony of USPCI's president Wesley Smith is consistent with that of the McDonnell–Douglas employees. *Id.* at Ex. USP–8, p. 134. Further, the United States stresses that USPCI admits to transporting hazardous substances including phenols and methylene chloride to Hardage on behalf of McDonnell–Douglas. *Id.* at Ex. USP–1. Finally, phenols and methylene chloride are listed as hazardous substances in 40 C.F.R. Table 302.4, and these substances have been detected at Hardage. United States' Brief at Ex. A. Based on these established facts, the United States seeks summary judgment on the issue of liability against USPCI.

In response, USPCI argues that affidavits of USPCI general manager Wesley Smith and environmental manager and president Harry Hansen directly contradict the deposition excerpts presented by the United States. The affidavits of Smith and Hansen represent that at no time did USPCI transport wastes of McDonnell–Douglas or Honeywell to a location not previously selected by these generators. USPCI Response at Ex. A & B. In addition, USPCI solicited business on its own initiative or at customer request by discussing customer transportation and disposal needs and available disposal options. *Id.* A proposal or quotation letter followed, which included USPCI's permits for disposal at Hardage. *Id.* The generator then either accepted or rejected the services USPCI offered. By this acceptance, USPCI argues the generators selected the site.

USPCI further represents that after 1976 the State of Oklahoma required each generator of hazardous waste to submit

---

shipper of such hazardous substance shall not be considered to have caused or contributed to any release during such transportation which resulted solely from circumstances or conditions beyond his control.
42 U.S.C. § 101(20)(B).
 CERCLA section 101(20)(C) provides:
 (C) In the case of a hazardous substance which has been delivered by a common or contract carrier to a disposal or treatment facility and except as provided in section 9607(a)(3) or (4) of this title (i) the term "owner or operator" shall not include such common or contract carrier, and (ii) such common or contract carrier shall not be considered to have caused or contributed to any release at such disposal or treatment facility resulting from circumstances of conditions beyond its control.
42 U.S.C. § 101(20)(C).

"disposal plans" specifying disposal location for industrial wastes. 63 Okla.Stat. § 1–2004(6). This Controlled Industrial Waste Disposal Act also required the preparation by generators of shipping manifests for each shipment indicating waste shipment destination. 63 Okla.Stat. § 1–2004(5). USPCI urges the Court to deny summary judgment against USPCI on the site selection issue after viewing the entire record as a whole.

The Court reviewed the voluminous record relating to USPCI in detail, as a whole, and scrutinized it is the light most favorable to USPCI, giving it every reasonable factual inference, as required. The Court finds that under *any* interpretation of the site selection requirement, a genuine issue of material fact exists as to whether USPCI "selected" the Hardage Site for McDonnell–Douglas and Honeywell hazardous waste disposal.

Accordingly, the United States' request for summary judgment on liability against USPCI is DENIED.

### E. STOCK YARDS

■ On May 10, 1989, Stock Yards stipulated that it arranged with a transporter for transport of livestock dipping vat waste, containing toxaphene, for disposal at the Hardage Site. United States' Brief at Ex. ONS–1. Based on this stipulation, the United States seeks summary judgment on Stock Yards' liability under Sections 106 and 107(a)(3) of CERCLA. 42 U.S.C. §§ 9606 & 9607(a)(3).

However, when Stock Yards executed its stipulation, it reserved the right to assert certain defenses allowed by Section 107(b)(3) & (i) of CERCLA. United States' Brief at Ex. ONS–1; 42 U.S.C. § 9607(b)(3) & (i). Stock Yards also reserved the right to assert other affirmative defenses allowed by other orders of this Court and CERCLA, and to contest the release or threatened release from Hardage of hazardous substances for which Stock Yards arranged disposal. United States' Brief at Ex. ONS–1.

As stated earlier in this Order, if the United States establishes each of the elements of liability, and the defendants are unable to prove the applicability of one of the defenses listed under Section 107(b) or other applicable defenses, the United States is entitled to summary judgment on the liability issue. *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d at 668. The Court finds the United States has established each of the elements of liability for Stock Yards under Section 107(a)(3). The burden then shifts to the Stock Yards to produce evidence *in this motion* to prove the applicability of its defenses. *Id.* In addition, the Court views the evidentiary submissions, if any, "through the prism of substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 254, 106 S.Ct. at 2513.

Obviously, Stock Yards misunderstands its burden and attempts to rely on bald pleadings, previous rulings of this Court on the status of those pleadings, and an order on its summary judgment motion, prior to the completion of discovery, to defeat this motion for summary judgment. No. CIV–86–1401–P (W.D.Okla. Jan. 15, 1987, dkt. no. 163 & Feb. 25, 1987, dkt. no. 167). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Advisory Committee Note to Fed.R.Civ.P. 56(e)). Stock Yards erroneously argued it had no responsibility to put forward *any* evidence in this motion until the United States puts forth requisite evidentiary material relating to these several defenses. Stock Yard's Response to United States' Reply at 2. Rather argues Stock Yards, "it is, of course, the government's task to try to show that all of these defenses are not genuine either in fact or law before response is required from the Stock Yards." *Id.*

Toward this end, Stock Yards wholly failed to comply with Local Rule 14(B) and provided no concise statement of material facts as to which Stock Yards contends no genuine issue exists concerning its defenses. W.D.Okla.R. 14(B). In addition, Stock

Yards presented *no* evidentiary submissions in support of its defenses.

Therefore, the Court finds Stock Yards has failed to prove the applicability of any of its defenses in *this* summary judgment motion, specifically the third-party causation defense under Section 107(b)(3) and estoppel. *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d at 668. This Court has previously ruled as a matter of law that CERCLA's pesticide application exclusion under Section 107(i) provides no protection to Stock Yards from liability because of disposal. No. CIV–86–1401–P (W.D.Okla. Nov. 9, 1989, dkt. no. 2097).

Accordingly, the Court finds the United States' motion for summary judgment on Stock Yards' liability under Sections 106 and 107(a)(3) is GRANTED.

## VI. JOINT AND SEVERAL LIABILITY

The United States seeks an order stating each of these seven (7) defendants are jointly and severally liable for all the response costs the United States has incurred or will incur in response to releases or threatened releases of hazardous substances from the Hardage Site. This Court previously interpreted CERCLA as imposing joint and several liability on defendants. No. CIV–86–1401–P (W.D.Okla. Nov. 28, 1989, dkt. no. 2256). If the harm is indivisible, as at Hardage, each defendant is jointly and severally liable for the entire harm, unless the defendant can prove the harm is divisible and that there is a reasonable basis for apportioning it. *Id.* at 9; *United States v. Monsanto Co.,* 858 F.2d at 171–73; *United States v. South Carolina Recycling & Disposal, Inc.,* 653 F.Supp. at 994. Only the Stock Yards attempted to contest the imposition of joint and several liability against it, on other than constitutional grounds.

In support of its request on liability, the United States produced the affidavit of Dr. Kirk Brown who testified the waste constituents at Hardage are thoroughly commingled. United States' Brief at Ex. B, ¶ 10. Brown concludes "[t]his commingling . . . renders it impossible to determine which party or source is responsible for each waste or contaminant." *Id.* As to Stock Yards specifically, the United States shows that the Stock Yards' toxaphene received no special treatment. *Id.* at Ex. C, p. 666. In addition, the United States showed it would be impossible to abate the release or threatened release of Stock Yards' waste. *Id.* at Ex. B.

Stock Yards responds the toxaphene deposited by Stock Yards at Hardage does not commingle or migrate, but is bound to the soils. Stock Yards' Response Brief at 4. Therefore, concludes Stock Yards, the United States' motion for joint and several liability of Stock Yards must be denied because of a factual issue regarding the commingling of waste disposed of by Stock Yards. *Id.* at 6.

 Here, as with the generator liability issue, Stock Yards misunderstands its burdens at the summary judgment stage. Once the United States presented evidence of commingling, the burden is on Stock Yards to show the harm is divisible and there is a reasonable basis for apportionment of liability. *United States v. South Carolina Recycling & Disposal Inc.,* 653 F.Supp. at 994; *see also United States v. Monsanto Co.,* 858 F.2d 160, 171–73. Although Stock Yards presents some evidence that toxaphene has not moved, it in no way shows where its waste is located at the Hardage Site, that Stock Yards can in any way remediate the toxaphene without remediating the entire area, or that the threat posed by the presence of the toxaphene is in any way distinct from the threat posed by the Hardage Site as a whole. Therefore, the Court finds Stock Yards has failed to meet its burden regarding the divisibility of the harm and to show any reasonable basis for apportioning liability or raise genuine issues of material fact regarding divisibility or apportionment.

Accordingly, the Court concludes the liability imposed against all the liable defendants, including Stock Yards, is joint and several.

## VII. CONCLUSION

The Court finds the United States has proven all of the elements for liability under CERCLA Section 107(a)(3) and (4)

against all defendants named in this motion, except USPCI. 42 U.S.C. § 107(a)(3) & (4). Therefore, the United States' motion for partial summary judgment on liability under CERCLA Section 106 and 107 is GRANTED against Cato, Dal–Worth, Double Eagle, JOC, Rockwell and Stock Yards. In addition, the United States' motion for partial summary judgment on liability is DENIED as to USPCI. The Court further concludes that each defendant upon which summary judgment is granted is jointly and severally liable under CERCLA Section 107(a) for response costs the United States has incurred or may incur, in investigating and cleaning up the contamination of Hardage. 42 U.S.C. § 9607(a). Further, the Court concludes as discussed in Section IV above that each of these defendants is liable for any applicable injunctive relief under CERCLA Section 106(a). 42 U.S.C. § 9606(a).

The United States shall file a final entry of judgment consistent with this Order and the local rules as applicable. W.D.Okla.R. 23.